**Monte D. FIELDS and Joseph A. Ford, Jr., Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 82–1573, 82–1621.

District of Columbia Court of Appeals.

Argued Nov. 16, 1983.

Decided Nov. 30, 1984.

---

Kenneth R. Rosenau, Washington, D.C., for appellant Fields.

Lawrence M. Baskir, Washington, D.C., for appellant Ford.

B. Shipley Thomas, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time brief was filed, Michael W. Farrell, Judith Hetherton, and J. Alvin Stout, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEWMAN, FERREN and BELSON, Associate Judges.

BELSON, Associate Judge:

Appellants were tried jointly on various charges arising out of two alleged armed robberies, the first on September 15, 1981,

and the second on September 25, 1981. Appellant Fields was found guilty of armed robbery, D.C.Code §§ 22–2901, –3202 (1981), with respect to each incident and of one count of carrying a pistol without a license, *id.* § 22–3204, with respect to the second incident. Appellant Ford was convicted of armed robbery with respect to the first incident and of being an accessory after the fact, *id.* § 22–106, to the second robbery. On this appeal, appellant Fields contends (1) that the counts arising from the September 15 incident were improperly joined with the counts arising from the September 25 incident; (2) that certain identification testimony should have been suppressed, and (3) that the evidence was insufficient to support the conviction for armed robbery on September 15. Appellant Ford's sole contention is that the evidence was insufficient to support his conviction as an accessory after the fact to the September 25 robbery. He does not appeal his conviction of the September 15 robbery.

We reject Fields' three arguments and therefore affirm his convictions. However, we agree with appellant Ford that the evidence was insufficient to convict him as an accessory and hence we reverse that conviction.

Roderick Robinson testified at trial that on September 15, 1981, he was working as the manager of the Rib Pit, a carryout restaurant. At about 10:15 that evening, as he was leaving work, he was approached by a man with a gun. By the light of a nearby street lamp he was able to see the man's face. Robinson later identified him as appellant Fields. While Fields held the gun on him, a second man came up and grabbed Robinson around the neck. Fields then removed money and Robinson's car keys from Robinson's pockets. The two men told Robinson to go back into the Rib Pit to get more money, but Robinson told them someone else had already picked up the restaurant's money. The two men then forced Robinson into his car and drove him around for 10 to 15 minutes. During this time Robinson was able to see the face of

the second man, whom he later identified as appellant Ford. As they were riding around, Robinson testified, his two assailants kept talking about getting more money. They removed from the car some more cash and a camera and other of Robinson's belongings. Finally the two men got out of the car and told Robinson to drive away without looking back.

A few moments later, Robinson pulled up alongside a police car and told the officer inside that he had just been robbed. The police officer did not take a report but told Robinson that he would send another officer to Robinson's destination to take the report. Although Robinson waited at the agreed location for about an hour, no officer ever came, and Robinson at that time took no further action to report the robbery.

Ten days later, September 25, 1981, Robinson was again on duty as manager of the Rib Pit. At about 6:20 that evening, Robinson testified, as he was coming out of the restroom, he saw a man with a gun to the side of the cashier, Steven Green. The gunman was wearing a light-colored jacket with blue stripes and an off-white cap. Robinson recognized him as being the man who had approached him with a gun on September 15.

Steven Green, the cashier, testified that on the evening of September 25 a man came into the Rib Pit, pointed a gun at him, and took money from the cash register. Green said the gunman was wearing a white jacket with blue on the sleeves and a white cap with a sailor emblem on it. Green also observed a ring and a watch on the robber's left hand.

Melvin Harris was the butcher at the Rib Pit on September 25. He testified that he observed the hold-up from a distance of 12–14 feet. The gunman, whose face he was able to see, was wearing a white jacket with blue on the sleeves and a "captain's hat" with gold trim.

After taking the money, the gunman went out the front door of the restaurant. Robinson and Harris went out the back

door and watched the robber get into a yellow Chevrolet with a black top. They then ran to Robinson's car and got in. Informed by a bystander of the direction the robber had taken, Robinson and Harris gave chase. They caught up with the yellow and black car, and pulled alongside at a red light. Both men recognized the driver as the man who had just held up the Rib Pit. Both men also testified they saw a woman next to the driver and another male in the back seat. Robinson recognized this second man as the second robber who had yoked him around the neck on September 15.

In the meantime, Steven Green had notified the police. A police car pulled up and stopped the yellow and black car. Robinson and Harris then drove back to the Rib Pit.

Police Sergeant James Avery testified that on September 25 he stopped a yellow and black Chevrolet in response to a radio broadcast of a robbery at the Rib Pit. Avery stated that appellant Fields was driving the car and appellant Ford was in the back seat. Avery observed a woman in the front seat putting something under the seat. From that area he recovered a white and blue jacket and a cap. In the trunk of the car Avery saw a brown bag containing money and a revolver.

Appellants were brought back to the Rib Pit about 10 minutes after the robbery and were viewed by Robinson, Green and Harris. Each of them was able to identify Fields as the gunman who had robbed the restaurant—at least when Fields was forced to don the jacket and cap recovered by Sergeant Avery. At a line-up on October 6, 1981, Robinson identified Fields and Ford as the men who had robbed him on September 15 and he identified Fields as

the gunman in the September 25 robbery. Finally, at trial, Robinson and Harris identified Fields as the gunman who had held up the Rib Pit and Ford as the man they had seen in the back of the yellow and black car.

**I**

■ Appellant Fields' first contention is that the charges arising from the two robberies .were improperly joined pursuant to D.C.Code § 23–311(a) (1981) and Super.Ct. Crim.R. 8(a), since they were not "of the same or similar character." However, Fields made no objection to the joinder in the trial court and in fact stated that he objected to a motion for severance filed by his codefendants.[1] At most, then, this court may review the joinder claim for plain error. *See Bittle v. United States,* 410 A.2d 1383, 1385 n. 2 (D.C.1980) (per curiam); *Evans v. United States,* 392 A.2d 1015, 1022–23 (D.C.1978); *Cupo v. United States,* 123 U.S.App.D.C. 324, 327, 359 F.2d 990, 993 (1966), *cert. denied,* 385 U.S. 1013, 87 S.Ct. 723, 17 L.Ed.2d 549 (1967).

■ Whether offenses may be joined under Super.Ct.Crim.R. 8(a) depends on whether "they are either similar in character or based on the same act or transaction." *Ray v. United States,* 472 A.2d 854, 857 (D.C.1984); *see also Winestock v. United States,* 429 A.2d 519, 524 (D.C. 1981). The fact that the offenses occurred some days apart is not a bar to joinder. *See id.* at 525–26 and cases cited therein. In this case, the offenses joined were two armed robberies 10 days apart, both involving the Rib Pit restaurant and its manager, Roderick Robinson. We think the joinder here was proper, and certainly not plain error.[2]

---

1. Initially Doris Floyd, who was the woman in the front seat of the yellow and black car, was to be tried with Fields and Ford, but her case was severed. Floyd apparently had filed a motion to sever offenses as well as defendants, and Ford had moved to sever defendants. The transcript is unclear whether Fields objected to only one of these motions or all of them.

2. As we explained in *Ray v. United States, supra,* 472 A.2d at 857, appellant Fields could have claimed that the more stringent requirements of Super.Ct.Crim.R. 8(b) apply, since there were two defendants. We are satisfied that the trial court did not commit plain error in failing sua sponte to sever under 8(b) since the two robberies can be viewed as a single series of transac-

■ Although not phrased as such, Fields' argument on this point may arguably be construed as alleging that the court's failure sua sponte to sever the offenses under Super.Ct.Crim.R. 14 was an abuse of discretion since Fields' brief complains that the joinder was prejudicial. *See generally Ray v. United States, supra,* 472 A.2d at 856–57; *Winestock v. United States, supra,* 429 A.2d at 524–27. Again, we find no plain error in the trial court's failure to order a severance on its own motion. Even assuming, *arguendo,* "that the evidence of the two robberies ... was not reciprocally admissible ..., appellant has failed to establish that the facts of the two crimes were not and could not be kept 'separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass.'" *Id.* at 527 (quoting *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978)).

## II

■ Fields' second contention is that the trial court erred in denying his motion to suppress all testimony concerning the identification of him at the September 25 show-up on the grounds that the show-up procedure was unduly suggestive and that the identifications were unreliable. Fields argues that the in-court identifications also should have been suppressed because they were tainted by the suggestive show-up procedure. Since we conclude that the show-up procedure did not create a substantial likelihood of misidentification, we hold that all of the identification evidence was properly admitted.

It is generally conceded that a degree of suggestivity is inherent in any on-the-scene viewing of a suspect in the custody of police. *See Singletary v. United States,* 383 A.2d 1064, 1068 (D.C.1978); *Russell v.*

*United States,* 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). It was heightened somewhat in this case by the fact that appellant apparently was handcuffed when he was shown to Harris and Green. This factor alone did not necessarily require suppression of the identifications, however. *Jones v. United States,* 277 A.2d 95, 97–98 (D.C.1971) (show-up identification admitted despite fact that suspect was shown to victim handcuffed in back seat of police car). The "central question" is "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Manson v. Brathwaite,* 432 U.S. 98, 106, 97 S.Ct. 2243, 2249, 53 L.Ed.2d 140 (1977) (quoting *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)).

In evaluating the likelihood of misidentification, courts are to consider the following factors:

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Manson v. Brathwaite, supra,* 432 U.S. at 114, 97 S.Ct. at 2253 (citing *Neil v. Biggers, supra,* 409 U.S. at 199–200, 93 S.Ct. at 382). Here, the evidence showed that the restaurant was lighted, and both Green and Harris testified that they were able to see the robber's face. Appellant concedes that Green and Harris "probably paid good attention to the events as they took place." Both men testified that the robber was a black male, about 5′ 10″ tall, and was

---

tions. *See* 8 J. Moore, Moore's Federal Practice § 8.06[1] n. 9 (rev. 2d ed. 1984) (citing *Johnson v. United States,* 260 F.2d 345 (10th Cir.1958), *cert. denied,* 360 U.S. 935, 79 S.Ct. 1454, 3 L.Ed.2d 1547 (1959), in which two defendants

were jointly charged with robbing the same bank on two occasions 5 weeks apart; suggests joinder in that case should have been upheld on the "series of transactions" test of Rule 8(b)).

wearing a white jacket with blue on the sleeves and a white hat with some gold trim or design on it.[3] The time between the robbery and the show-up was only about 10 minutes.

Appellant Fields' principal attack on the reliability of the show-up identification concerns the witnesses' level of certainty. In particular he argues that the identifications were unreliable because the witnesses were unable to recognize appellant until he was forced to don the jacket and cap found under the front seat of the car in which he was driving. We are not persuaded. Appellant Ford was shown first to Green and Harris. Neither one identified him as the robber. Then appellant Fields was shown without the jacket and cap. Officer John Spiegel testified that neither Green nor Harris identified him as the robber at that point. However, Harris testified that he recognized Fields as both the robber and the driver of the getaway car *before* Fields was made to put on the jacket and cap. Green stated that when Fields was shown to him without the jacket and cap he was not sure.

Both men, however, were sure that Fields was the robber when he was shown to them wearing the blue and white jacket and cap. Green testified that Fields was making faces, and that he asked the police to have Fields stop. When Fields did stop, Green was able to recognize him by his face. Green also recognized Fields as the robber by the watch and ring Fields was wearing.

Having weighed all the pertinent factors, we conclude that although the show-ups involving Green and Harris were somewhat suggestive, there was not a "substantial likelihood of irreparable misidentification." [4] *Manson v. Brathwaite, supra,* 432 U.S. at 116, 97 S.Ct. at 2254 (quoting *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)). Accordingly, we also reject appellant's argument that the in-court identifications should have been suppressed as the products of impermissibly suggestive pretrial identifications. *See Neil v. Biggers, supra,* 409 U.S. at 196–97, 93 S.Ct. at 380–81 (quoting *Simmons v. United States, supra,* 390 U.S. at 384, 88 S.Ct. at 971). *See also United States v. Walton,* 411 A.2d 333, 338–39 (D.C.1979).

## III

█ Finally, appellant Fields asserts that the evidence was insufficient to support a conviction of armed robbery with respect to the September 15 incident. The government contends that appellant failed to move for judgment of acquittal on that count either at the end of the government's case or at the close of all the evidence; therefore, it argues, our review is barred except to correct "manifest error" or "serious injustice." *See Richardson v. United States,* 276 A.2d 237 238 (D.C.1971). Although the matter is not without doubt, a close reading of the transcript reveals that while appellant challenged the sufficiency of the evidence of other counts, he did not contest it with respect to the armed robbery count.[5]

---

**3.** Appellant Fields does not contend that the descriptions were inaccurate.

**4.** Appellant's brief makes no specific reference to the identification by Robinson, the restaurant manager, the third witness who identified Fields, although the brief appears to challenge generally all of the show-up identifications. We think it is clear from the record that Robinson's identification was reliable. He had an adequate opportunity to see the robber inside the restaurant and recognized him from the September 15 robbery. When Fields and Ford were brought back to the restaurant by police, an apparently unplanned showing occurred as Robinson saw

them being taken out of the police vehicles. Although Fields was not wearing the jacket and cap, Robinson recognized him as the hold-up man. He had no doubt about his identification.

**5.** Appellant was charged with grand larceny of money, which the prosecutor explained referred to the charge that some time after they first accosted Robinson appellants stole money from his car. Although appellant's counsel at one point said he was moving for dismissal of the robbery count, it appears from the entire discussion that he was contending only that there was insufficient evidence that appellant took money

In any event, we are convinced that the evidence was sufficient to support appellant's conviction regardless of whether we apply the usual standard or the *Richardson* standard. Robinson testified that as he was leaving the Rib Pit on the evening of September 15, 1981, he was approached by a man with a gun. Although it was dark outside, there was a streetlight nearby that shed enough light for him to see the robber's face. Robinson identified appellant Fields as the man at the show-up on September 25, at a subsequent line-up, and in court.

Appellant argues that Robinson's credibility is undermined by his failure to file a police report of the incident and by the sheer improbability that the same victim would be robbed twice by the same man in 2 weeks. However, the uncontradicted evidence showed that Robinson did promptly notify police of the robbery. Officer Arthur Peete testified that on September 15, 1981, he received a robbery report from Robinson but that he did not take down any details because he was on another call. Robinson testified that the officer told him that another police car would come to take the report, that he waited more than an hour, but that no car ever came.

Appellant also protests that the evidence showed that Robinson knew appellant and therefore could have named him to police as his assailant. Robinson flatly denied that he knew appellant, however.

In essence, appellant asks that we examine the evidence in the light most favorable to him. As we are required to view the evidence in the light most favorable to the government, however, we cannot say that a reasonable jury could not have found guilt beyond a reasonable doubt. *See Dyson v. United States*, 450 A.2d 432, 436 (D.C. 1982).

## IV

■ Appellant Ford was acquitted of taking part as a principal under an aiding from the car in the course of the alleged larce-

and abetting theory in the September 25 robbery of the Rib Pit, but was convicted as an accessory after the fact to that offense. He contends that the evidence was insufficient to support his conviction.

■ Like his codefendant, however, appellant Ford failed to preserve the issue for appeal. Indeed, Ford's counsel twice expressly disavowed seeking a judgment of acquittal on the accessory count. Thus, we may reverse for insufficiency of the evidence only to avoid "serious injustice" or "manifest error." *Richardson, supra*, 276 A.2d at 238. We are satisfied that even under that standard, reversal is required.

■ An accessory after the fact is one who, knowing an offense to have been committed by another, receives, relieves, comforts, or assists the offender in order to hinder the offender's apprehension, trial, or punishment. *Clark v. United States*, 418 A.2d 1059, 1061 (D.C.1980); *accord, Williams v. United States*, 478 A.2d 1101, 1105 (D.C.1984); *United States v. Barlow*, 152 U.S.App.D.C. 336, 343, 470 F.2d 1245, 1252 (1972). We think there was enough evidence for the jury reasonably to have inferred that Ford knew Fields had robbed the Rib Pit. Robinson testified that Ford had aided Fields in robbing him on September 15, 1981—evidence the jury apparently believed. Moreover, Robinson testified that in the course of that incident Fields and Ford told him to go back into the restaurant to get more money, a suggestion Robinson successfully parried by telling Fields and Ford the money had already been picked up for the night. Ten days later Fields returned to the Rib Pit, this time earlier in the evening, and enjoyed temporary success in a second hold-up. After taking the money, he got into a car in which, inferentially, Ford was present and drove off. When police stopped the car, the woman in the front seat next to Fields was seen stuffing under the seat the jacket and cap Fields had worn during the robbery. From this evidence, we think a rea-

ny. Fields was acquitted of that charge.

sonable jury could have inferred that Ford knew Fields had committed a robbery at the restaurant.[6]

However, the government's case against Ford as an accessory founders by reason of the weakness of the evidence that Ford did anything after the robbery to assist Fields "in order to hinder [Fields'] apprehension, trial, or punishment." *Clark, supra,* 418 A.2d at 1061 (quoting *Skelly v. United States,* 76 F.2d 483, 487 (10th Cir.), *cert. denied,* 295 U.S. 757, 55 S.Ct. 914, 79 L.Ed. 1699 (1935)). The getaway car was owned by Fields and was driven from the scene by Fields. The only evidence to which the government points to show that Ford aided Fields' escape is contained in the following portion of Robinson's testimony describing what happened when Robinson pulled his car alongside the getaway car:

Q. Now, could you see who was driving the car?

A. Yes.

Q. Who did you recognize that person as?

A. As the one that was in the store that had the gun.

   .     .     .     .     .

Q. Now, was there anyone in the back seat of the car?

A. Yes.

Q. Were there any adults in the back seat?

A. Yes.

   .     .     .     .     .

Q. Now, the adult—was that a male or a female?

A. Male.

Q. Did you recognize that male?

A. Yes.

Q. And how did you recognize that male?

A. I recognized him as the guy who had robbed me on the 15th.

Q. Now, was this the first guy who approached you with the gun [Fields] or the second male who yoked you around the neck [Ford]?

A. The second.

Q. Now, what did you do after seeing these people in the car?

A. I stood there and just sat there and watched them for a few seconds.

And as he reached over to bend over like he was going under the seat—it was a red light. So I was honking my horn and was going through the red light where I seen a policeman on the parking lot—Volkeswagon [sic] parking lot dealer.

A. Why did you go through the red light and honk your horn?

A. I went through the red light because I seen he was going under the seat. I didn't know what exactly he was going under there for.

The government asserts that it was Ford who reached under the seat. Although Robinson did not know what the man was reaching for, he knew that a gun had been involved in the robbery. Thus, the government concludes, "[t]he jury could infer that Ford's action was intended to insure the successful escape of Fields by threatening Robinson."

■ As we have recognized in the context of investigatory stops and probable cause determinations, furtive movements, when combined with other factors, may be suggestive of criminal activity. *See Adams v. United States,* 466 A.2d 439, 444 (D.C.1983); *Price v. United States,* 429 A.2d 514, 517 (D.C.1981); *Lawson v. United States,* 360 A.2d 38, 39–40 (D.C.1976) (per curiam). In this case, however, even assuming it was Ford to whom Robinson was referring, we seriously question whether a reasonable jury could have found beyond a reasonable doubt that Ford's bending over as if to reach under the seat constituted the "rendering [of] as-

---

**6.** Indeed, this evidence may well have been sufficient to support Ford's conviction as a principal on the theory he had helped Fields *plan* the robbery. The jury, however, acquitted Ford of the aiding and abetting charge.

sistance to hinder or prevent the arrest of" an offender that is the "gist of being an accessory after the fact." *Barlow, supra,* 152 U.S.App.D.C. at 343–44, 470 F.2d at 1252–53; *see Clark, supra,* 418 A.2d at 1061.

The strength of the evidence of Ford's guilt as an accessory is diminished even further by the ambiguity as to whether Robinson indeed was referring to Ford when he testified that "he" reached under the seat. While it is true that just before this statement Robinson had been describing the occupants of the car and that the last one described was Ford, it appears that the prosecutor had turned to the general subject of what happened next. Given that it was Fields who had had a gun both in the September 15 robbery and in the restaurant hold-up moments before, it is at least as likely that Robinson was referring to Fields.

In our view, then, the evidence was clearly insufficient for a reasonable jury to have concluded beyond a reasonable doubt that Ford assisted Fields in order to hinder Fields' apprehension. *See Clark, supra,* 418 A.2d at 1060–61; *Barlow, supra,* 152 U.S.App.D.C. at 343, 470 F.2d at 1252. This paucity of evidentiary support for the verdict is a factor we must weigh in determining whether we should review Ford's claim of error under the "serious injustice" standard.

We further note that there is another ground not mentioned in Ford's brief, but addressed at oral argument, that we must consider in making that determination. It is that Ford could not have acted as an accessory after the fact until the crime of robbery had been completed.

In our recent opinion in *Williams v. United States, supra,* 478 A.2d 1101, this court clarified the relationship between the offenses of aiding and abetting robbery and accessory after the fact to robbery. In *Williams,* the government's evidence showed that three men robbed a jewelry store. Immediately afterward, they crouched between parked cars and then appeared to "sneak" into a car driven by the defendant, Johnson. Johnson admitted that when the three men got into the car one of them was armed with a pistol and someone hollered, "Drive, drive, drive!" Johnson drove about 2 blocks when the getaway car was stopped by police. Johnson was charged only as an accessory after the fact, and was convicted.

This court reversed, holding that while Johnson may have been guilty of aiding and abetting the robbery, she could not have been an accessory *after* the fact because the robbery was still in progress while she was allegedly rendering aid to the three men. We adopted the analysis of *Barlow, supra,* 152 U.S.App.D.C. at 344, 470 F.2d at 1253, in which the circuit court held that the asportation continues "at least so long as the perpetrator of the crime indicates by his actions that he is dissatisfied with the location of the stolen goods immediately after the crime." *Id.* (quoted, in *Williams, supra,* 478 A.2d at 1105). *See also Clark, supra,* 418 A.2d at 1062 (alternative holding) (court "seriously doubt[s] the appropriateness of a conviction as an accessory after the fact of a driver of a getaway car containing a person who has committed [armed robbery] and who is still being pursued by the police"); *Jordan v. United States,* 350 A.2d 735, 738 (D.C. 1976) (fact that money was taken from victim during car ride but before car entered the District is not a valid jurisdictional defense because "robbery takes on the characteristics of a continuing offense when there is a lapse of time between the taking and the safe escape of the robber with the proceeds"); *Carter v. United States,* 96 U.S.App.D.C. 40, 42, 223 F.2d 332, 334 (1955) (in felony murder case, jury could find that robbery was still in progress when pursuing police officer was shot even though there had been a slight delay between robbery and commencement of pursuit). *But see United States v. Irving,* 141 U.S.App.D.C. 216, 217, 437 F.2d 649, 650 (1970) (reversible error to instruct jury that getaway driver could be guilty of

aiding and abetting robbery where driver learned of robbery only when thief emerged from bank with sack of money; instruction described offense of accessory after the fact, not aiding and abetting).

The case before us is essentially on all fours with *Williams, supra,* 478 A.2d 1101. Although Ford was not driving the getaway car, the act which purportedly aided Fields' escape occurred during the immediate flight from the scene of the robbery and while Fields was being pursued. Since the robbery was still in progress, Ford could not be an accessory after the fact.

In view of the insufficiency of the evidence that Ford assisted Fields in order to hinder Fields' apprehension, and the fact that even the ambiguous evidence relied on by the government related to a time when the robbery was still in progress rather than after its commission, we conclude that a serious injustice would result from affirming Ford's conviction on this particular event.

For the reasons stated above, we reverse appellant Ford's conviction as an accessory after the fact to the September 25, 1981, robbery. Appellant Fields' convictions, however, are affirmed.

*So ordered.*