Marshall **HOLLINGSWORTH**,
Appellant,

v.

**UNITED STATES, Appellee.**

No. 84–705.

District of Columbia Court of Appeals.

Argued Feb. 24, 1987.
Decided Sept. 25, 1987.

---

Gerald I. Fisher, with whom Cynthia Wimer Lobo, Washington, D.C., was on the brief, for appellant.

David Howard Saffern, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN, TERRY, and ROGERS, Associate Judges.

TERRY, Associate Judge:

After a jury trial, appellant was convicted of armed robbery,[1] carrying a pistol without a license,[2] possession of an unregistered firearm,[3] and possession of ammunition without a registration certificate.[4] Concluding that the trial court abused its discretion in three respects and that appellant's defense was thereby prejudiced, we reverse the armed robbery conviction and remand the case for a new trial on that charge. The convictions on the pistol and ammunition charges, however, are affirmed.

1. D.C.Code §§ 22–2901 and 22–3202 (1981).

2. D.C.Code § 22–3204 (1981).

3. D.C.Code § 6–2311(a) (1981).

4. D.C.Code § 6–2361(3) (1981).

**I**

On the afternoon of February 15, 1983, Frederick Baker went to a service station on Fourteenth Street, N.W., to discuss certain repairs of his automobile which were to be done by a mechanic who worked there, Earl Mines. Baker was carrying $1,003 in cash, taken from his savings, with which he intended to pay for the repairs. Mines was not working that day, however, so Baker left the station with the money still in his pocket and walked to the Chez Maurice restaurant on Ninth Street, where he worked as a porter.[5]

At about 4:00 p.m., just a few minutes after he arrived and started to work, Baker was robbed of all his money at gunpoint in the vestibule of the restaurant. Baker recognized the robber as a man he had seen in the neighborhood at least a dozen times before, often driving a yellow compact car. The robber drove off in a yellow compact car, the license number of which Baker promptly wrote down as CYL–271.

The next day, February 16, Baker went to police headquarters and identified appellant Hollingsworth as the robber from an array of color slides. On the basis of this identification the police obtained a warrant, on which Hollingsworth was arrested on March 8. He was released on bond the same day and ordered to appear in a lineup on March 16. Mr. Baker attended that lineup and identified Hollingsworth in person as the man who had robbed him.

After the lineup, as Baker was leaving police headquarters in the company of Detective Robert Panko, he saw a yellow car parked across the street. Even though the license plates bore a different number, he recognized it immediately as the robber's car and identified it as such to Detective Panko. Investigation revealed that Hollingsworth's wife had owned a yellow Toyo-

5. Mines had earlier told Baker that the repairs, which included the installation of a new motor, would cost him "$800 or better." Mines did do some work on the car, but he was never paid. The car was later parked on the street and eventually was towed away.

ta on the date of the robbery, February 15, and that Hollingsworth himself had applied for new license tags on February 18, claiming that one of the old tags had been lost.[6]

Hollingsworth was arrested again on March 24 in connection with an ongoing narcotics investigation. In his pocket the arresting officers found a .38 caliber "hammerless" snub-nosed revolver and six live rounds of .38 caliber ammunition. Baker identified this gun, which had a distinctive appearance,[7] as the one used in the robbery.

The defense theory was that Baker had completely fabricated the robbery in order to avenge an earlier dispute with Hollingsworth. Carol Ray testified that she witnessed that dispute at the restaurant on February 14, the day before the robbery.[8] She said that as Hollingsworth, whom she knew as a friend of her fiance, left the restaurant, he was grabbed by a man she had never seen before. After a verbal exchange, Hollingsworth "popped" the other man and walked away. As he did so, the other man exclaimed, "I'm going to fix you, man, I'm going to get you," or "something like [that]."

Ray testified that she had seen the man who had threatened Hollingsworth in the courthouse during the trial. The description she gave of this man seemed to fit Baker, but Ray never made an actual identification of Baker as the one whom Hollingsworth had hit. Consequently, while Ray was on the stand, defense counsel proposed that Baker be brought into the courtroom so that Ray could look at him and tell whether he was the same man. The prosecutor objected, and the court denied the request.

After the defense rested,[9] defense counsel learned that Baker had allegedly threatened Ray in the hallway of the courthouse after her testimony. According to defense counsel, Baker told Ray that she would be "taken care of too." Counsel moved to reopen the case and recall Ray so that she might testify about this threat, but the court denied the motion.

The jury found Hollingsworth guilty as charged. On appeal he makes numerous assignments of error. First, he argues that the trial court improperly prevented Carol Ray from making an in-court identification of Baker. Second, he maintains that he should have been allowed to recall Ray so that she could testify about the threat Baker made against her. Third, he asserts that the trial court erroneously rejected his counsel's repeated efforts to show the relevance of certain testimony. We find merit in all three of these arguments, and accordingly we reverse Hollingsworth's armed robbery conviction.[10]

---

**6.** Charles Ralls, an investigator for the Maryland Department of Motor Vehicles, testified that license plates bearing the number CLY–271 (not CYL–271) had been issued to a 1979 Toyota registered to Hollingsworth's wife. New plates were issued for this Toyota on February 22, 1983, on the basis of an application filed on February 18 which stated that one of the tags had been lost. It was stipulated that the application bore Hollingsworth's signature. Hollingsworth's wife later testified, after waiving her marital privilege, *see* D.C.Code § 14–306(a) (1981), that the tags had not been lost and that her husband had access to her car on February 15.

**7.** Mr. Baker, who apparently had some knowledge of guns, described this gun as "hammerless" because the hammer was not visible, as it is on a "normal" .38 revolver. Such guns, he said, are "not very commonly used."

**8.** Ray remembered the date, Valentine's Day, because it was the day she had received her engagement ring.

**9.** The defense also presented two alibi witnesses, Felicia Garcia and Mary Tucker, employees of the District of Columbia Department of Human Resources. Garcia, with the aid of her records, testified that Hollingsworth was at her office on Valley Avenue, S.E. (far from the Chez Maurice restaurant), from 3:14 to 4:30 p.m. on the day of the robbery, inquiring about his sister's missing social security check. Tucker generally corroborated this testimony. The trial court granted the government three brief continuances to obtain witnesses whose testimony would rebut that of Garcia and Tucker.

**10.** We therefore do not consider most of Hollingsworth's other claims of trial court error, since a new trial will make them moot. The one issue that is not moot—whether the court should have severed the February 15 robbery charge from the charges relating to Hollingsworth's possession of the pistol and ammunition when he was arrested on March 24—we shall discuss in part V, *infra*.

## II

Defense counsel requested the trial court to permit an identification commonly known as a one-person showup. In essence, counsel wanted Frederick Baker, the complaining witness, to come into the courtroom and be identified by Carol Ray as the man whom she had heard threatening Hollingsworth. When counsel first asked the court for a showup identification, the prosecutor quickly objected, saying, "This is not an identification procedure." The trial court found this objection to be "valid" and denied the request.

Later, before the jury returned from its luncheon recess, defense counsel again requested a showup. Although counsel acknowledged that Ray had already described the man who had threatened Hollingsworth—a description which counsel said was "clear enough"—she still felt that a showup would add credibility to Ray's identification of Baker. At this point the following occurred:

Ms. McLaughlin [the prosecutor]: Your Honor, for the record I think it's entirely suggestive and inappropriate. I am sure if we attempted to do that with the defendant we would not even get to trial.

The Court: That's right.

Ms. McLaughlin: This is a year later. It's a very suggestive situation. She knows at this point that he is a victim in the case. And I would just object strenuously. I think it is highly improper.

Ms. Gunning [defense counsel]: Your Honor, I think the government does that with the defendant all the time when obviously they ask their witness to point the defendant out in the courtroom. Who else is it going to be? It's not a woman who is the defendant. It's not a white male who is the defendant. And even if the government—

The Court: Ms. Gunning, if you can't see the difference I am not going to take the time to explain it to you. *I think the thing is so elementary that the suggestivity here, and of course, in-court identification is only one, it's not a lineup, it's not the photo array that you people as defense counsel always insist upon, having fairness, no suggestivity.* As I say, you have your point on the record. If you can't see the reason for it, I think it's a little bit late for me to try to tell you. But that's my ruling. [Emphasis added.]

These comments reveal that the trial court's only reason for denying defense counsel's request was its belief that such a showup would be too suggestive. In the factual circumstances of this case, however, that was not a proper reason. To be sure, there are many cases addressing the evils of the one-person showup. The Supreme Court, for example, has said in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup, has been widely condemned." *Id.* at 302, 87 S.Ct. at 1972 (footnote omitted); *see also Fields v. United States,* 484 A.2d 570, 574 (D.C.1984), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2144, 85 L.Ed.2d 501 (1985); *Singletary v. United States,* 383 A.2d 1064, 1068 (D.C.1978); *Russell v. United States,* 133 U.S.App.D.C. 77, 81, 408 F.2d 1280, 1284, *cert. denied,* 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969). When used at trial, rather than at the scene of the crime, the one-person showup may be the most suggestive identification procedure possible. 1 W. LaFave & J. Israel, Criminal Procedure § 7.4(g) (1984).

Almost invariably, however, such criticisms are made when the person being viewed is a suspect or a defendant in a criminal case, because the suggestivity inherent in a one-person showup implicates a defendant's right to due process of law. *See Stovall v. Denno, supra,* 388 U.S. at 301–302, 87 S.Ct. at 1972. In the instant case the proposed showup was intended to identify not the defendant, but rather the complaining witness. Thus, even if Ray had identified Baker by suggestive means, Baker would not have run the risk of imprisonment. Consequently, the due process concerns which have prompted countless discussions in the twenty years since *Stovall* do not apply here.

■ We held in *Berryman v. United States*, 378 A.2d 1317, 1319–1320 (D.C. 1977), that a trial judge has discretion to order the defendant to stand in a lineup, even during trial, when the court deems it "appropriate" to do so.[11] We think the court has the same type of discretion to require a witness to be identified by another witness, and to establish the procedure for such an identification, when the court deems it appropriate. This is not to say, of course, that such requests as that made here by defense counsel should be routinely granted; the great majority of them, we suspect, will probably be denied. *See, e.g., People v. Kent,* 125 Cal.App.3d 207, 218, 178 Cal.Rptr. 28, 35 (1981) (upholding trial court's refusal, on grounds of relevance, to order a one-person showup of someone other than the defendant). What we are saying is simply that a trial court must exercise its informed discretion in ruling on such a request and must not deny it out of hand.

■ For this reason we conclude that the trial court abused its discretion when it denied defense counsel's request for a showup identification of Frederick Baker by Carol Ray. The failure of a court to recognize that it has discretion may itself be an abuse of discretion. *Johnson v. United States,* 398 A.2d 354, 363 (D.C. 1979). "Similarly, when the trial court recognizes its right to exercise discretion but declines to do so, preferring instead to adhere to a uniform policy, it also errs." *Id.* (citations omitted). Therefore, whether the court's ruling here reflected an unawareness that it had discretion to order a showup or was simply a refusal to exercise it, based on an erroneous legal premise, that ruling was error.

Not all such errors are reversible, however. "When the trial court's error is not so extreme as to require reversal by itself ... the reviewing court must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result." *Id.* at 367 (citation omitted). In deciding whether reversal is required, we must review the challenged ruling in the context of the whole record.

The entire defense case rested on the theory that Baker had fabricated his testimony about being robbed on February 15 in order to get even with Hollingsworth for their quarrel on February 14. Carol Ray's identification of Baker as the man she saw at the restaurant was a key element of that defense. If the jury doubted that Baker was the man she saw, her testimony would be severely undermined. The prosecutor, recognizing this, sought in her closing argument to minimize the value of Ray's testimony, particularly her identification of Baker in the hallway of the courthouse. In her initial summation, the prosecutor asserted that Ray's testimony was "not worthy of your serious consideration," and in rebuttal she stressed at some length the weaknesses in Ray's testimony, arguing that her hallway identification was "worth nothing."[12] Such arguments would have been impossible, or at least highly unlikely, if Ray had been able to identify Baker in the courtroom, in the presence of the jury. On this record, given the centrality of Ray's identification of Baker to Hollingsworth's defense, we conclude that the two-pronged test of *Johnson*[13] is satisfied, and that the trial court's denial of defense counsel's request for a showup caused sufficient prejudice to Hollingsworth's defense to warant reversal.

**11.** "Generally, such a lineup may be appropriate where the defendant, on timely motion, makes a showing that eyewitness identification is materially at issue, and there exists, in the particular case, a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." *Berryman v. United States, supra,* 378 A.2d at 1320 (footnote omitted); *accord, Jackson v. United States,* 395 A.2d 99, 104 (D.C.1978).

**12.** The prosecutor also pointed out, during Ray's cross-examination, that Ray had not made any formal identification of Baker.

**13.** In considering a claim of abuse of discretion by the trial court, we "must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal." *Johnson v. United States, supra,* 398 A.2d at 367.

## III

After Ray testified, Baker allegedly saw her in the hallway of the courthouse and threatened that she would be "taken care of too." Defense counsel first notified the trial court of this event after the defense had rested its case. But the trial court denied counsel's request to recall Ray, stating, "I think you would take that up in another forum. That's not a part of this case." When counsel suggested that the prosecutor could ask Ray "what happened with Mr. Baker," the court replied, "I am not interested in that. I am interested in completing this case." The government then proceeded with its first rebuttal witness.

This happened on a Friday afternoon. On Monday morning, when the trial reconvened, defense counsel filed a written motion requesting permission to recall Ray. At a bench conference the court denied this and a companion motion for a mistrial, explaining:

> We have a jury waiting. I think this is a stall. And I have not appreciated the tactics of you and your co-counsel during this whole trial. You have this in writing. I will put it in the file. You are entitled to that. I do not have to listen to any more of this. Fine. Let's go ahead with the trial.

■ There can be no question that the bias of a witness is always relevant to that witness' credibility. E.g., Ramirez v. United States, 499 A.2d 451, 454 (D.C.1985); Wynn v. United States, 130 U.S.App.D.C. 60, 62, 397 F.2d 621, 623 (1967); Villaroman v. United States, 87 U.S.App.D.C. 240, 241, 184 F.2d 261, 262 (1950). In a criminal case, "the Confrontation Clause of the Sixth Amendment requires a defendant to have some opportunity to show bias on the part of a prosecution witness." United States v. Abel, 469 U.S. 45, 50, 105 S.Ct. 465, 83 L.Ed. 450 (1984), citing Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). That opportunity, furthermore, is not limited to cross-examination of the challenged witness; bias may also be shown by extrinsic evidence. In re C.B.N., 499 A.2d 1215, 1218–1219 (D.C. 1985). When the alleged bias involves the chief government witness in a criminal case, as it does here, "[t]he opportunity to present evidence of bias becomes particularly important." Benjamin v. United States, 453 A.2d 810, 811 (D.C.1982) (citations omitted). While the trial court has some discretion to regulate the manner in which, and the extent to which, bias may be proven, it may not exclude such proof entirely. Id. at 812.

■ Baker's alleged threat against Ray certainly showed one form of bias—hostility—against Hollingsworth. See, e.g., Staton v. United States, 466 A.2d 1245, 1250 (D.C.1983). Although Baker directed the threat only to Ray, it clearly revealed Baker's hostility toward Hollingsworth as well. Baker's statement that Ray would be "taken care of too " implied that he would seek revenge against Ray, just as he had against Hollingsworth. Baker's threat to Ray, therefore, constituted solid evidence of bias which Hollingsworth should have been allowed to present to the jury. The jury may have disbelieved that evidence, but it surely was entitled to hear it.

Furthermore, Baker's threat to Ray was different from the threat he allegedly made to Hollingsworth the day before the robbery.[14] Assuming, of course, that the threat to Ray in fact occurred, it showed the extent of Baker's animosity; for Baker not only threatened Hollingsworth and (according to the defense) made good on this threat by fabricating a robbery charge, but also attempted to intimidate a key defense witness. Such evidence would suggest that Baker's rage against Hollingsworth was so extreme that those who dared to help Hollingsworth also risked reprisals. Thus the evidence of Baker's threat to Ray was highly relevant; it did not simply reiterate the prior evidence of bias. The trial court, however, summarily denied defense counsel's request to recall Ray.

14. Ray testified that the man she had seen quarreling with Hollingsworth, whom she also saw in the courthouse hallway, had said to Hollingsworth something like "I'm going to fix you, man, I'm going to get you."

We have often recognized that a trial judge has discretion to decide the manner of proving bias and the extent to which it may be shown. *Benjamin, supra,* 453 A.2d at 812. Moreover, since the defense had already rested by the time Ray received the threat, she could have testified only if the court had allowed the case to be reopened, another decision committed to its sound discretion. *E.g., McClain v. United States,* 460 A.2d 562, 569 (D.C.1983). But a refusal to exercise discretion will, in many cases, constitute an abuse of discretion. *Johnson v. United States, supra,* 398 A.2d at 363. We think it did so in this case. We hold that the trial court erred when it failed to exercise any discretion in denying the defense request to reopen its case and recall Carol Ray. We also conclude that the court's error quite likely resulted in prejudice to the defense. As we noted in *Benjamin,* evidence of bias in a key government witness is highly probative; the court's refusal to permit such evidence to be introduced, in the circumstances presented here, improperly weakened the defense case and requires reversal.

## IV

■ Hollingsworth's most significant contention on appeal is that the trial court repeatedly refused to hear his counsel's proffers on the relevance of certain testimony. As we have said, the defense theory was essentially that Baker had made up the entire story about the robbery. To develop this theory, Hollingsworth tried to show that Baker did not really have $1,003 in cash in his pocket on February 15. Baker testified that he was taking this money to pay for auto repairs, an explanation thoroughly probed by defense counsel on cross-examination:

Q. And you had been at the Exxon Station talking to Mr. Mines?

A. Mr. Mines, yes, sir, Earl Mines.

Q. And he was the guy who had been working on your car?

A. That's correct.

Q. And he was supposed to what, put a new motor in or something?

A. He was supposed to repair my car.

Q. Okay. And he had not completed the repairs on it, correct?

A. No, he had not.

Q. But you had gathered up this money in order to pay Mr. Mines?

A. In anticipation of the cost, yes, I had.

Q. And you had seen Mr. Mines that very day, right?

A. No, I did see—I did not see Mr. Mines that day. I saw his boss. Mr. Mines was off that day.

Q. Had you seen Mr. Mines the day before?

A. No, I had—

Ms. McLAUGHLIN: Objection, Your Honor. I think this line of questioning is really not relevant.

THE COURT: What is the relevancy?

MR. WOOD [defense counsel]: To establish [what] the money was for.

Ms. McLAUGHLIN: Well, Your Honor, regardless [of] what the money was for, people can't be robbed, whether it's for a car or any other means.

Soon thereafter, defense counsel continued:

Q. Now, this work that Mr. Mines was supposed to have done on your car, had he done any work on the car?

A. Yes, he had.

Q. Had he given you a written estimate for the work he was going to do on that car?

A. No, he had not.

Q. Do you know when you brought this car in to Mr. Mines?

Ms. McLAUGHLIN: Your Honor, I am going to object. I mean, some questions I am not objecting to, just in terms of the general background. But I don't see the relevance of going into—

MR. WOOD: *May we approach the bench, Your Honor?*

THE COURT: *No. It's not necessary to approach the bench. She has made an objection about relevancy before. I thought I sustained it.* [Emphasis added.]

Defense counsel then began to inquire how Hollingsworth had been able to accumulate so much cash:

Q. Now, had you been collecting this money for a while?

A. Over a period of time. It's my savings.

Q. Okay. Over what period of time, Mr. Baker?

MS. MCLAUGHLIN: Your Honor, I object again. I just don't see the relevance of—

THE COURT: We are getting back into this again.

MR. WOOD: *Well, Your Honor, may we approach the bench so I can explain it?*

THE COURT: *No. I don't like bench conferences. I said many times it's like whispering in front of company. And I don't like to do that. Ninety-nine times out of a hundred it's nothing to be said anyway. And the track you are on is irrelevant. I ruled [on] it twice. Now three times you will be out. Now let's get on [to] something else.* [Emphasis added.]

Defense counsel tried to explore the same subject when cross-examining Earl Mines, the mechanic who supposedly was to repair Baker's car. Mines testified that he and Baker never set an exact date of payment for the repairs, and that he never prepared a written estimate. After Mines had had the car for two or three months, he parked it on Florida Avenue in order to have more room at his station. Eventually, however, Baker's car was towed away. Counsel asked Mines whether he had ever told Baker that the car might be towed, whether Baker had ever explained that he could no longer pay for the repairs because he had been robbed, and whether Baker was upset when he discovered that his car had been towed. The trial court sustained all of the prosecutor's objections to these questions on grounds of relevance.

After a brief redirect examination, Mines stepped down from the witness stand. At a bench conference that immediately followed, defense counsel attempted to explain the relevance of his questions, but he was cut off by the court:

MR. WOOD: Your Honor, the reason I want—

THE COURT: *I am not interested. Just because you have some wild theory I don't have to listen to it.* I don't have to inflict it on the jury, see. If you want to have wild theories, that's up to you and you run the risk of it. But if it goes outside the bounds of relevancy or materiality I am going to rule that way.

MR. WOOD: *It would have been relevant to show—*

THE COURT: *No. I don't want you to take up my time and the time of this jury. If you have anything, you can put it in writing. But so far the theories that you have been trying to inflict on this Court have been really way out. And I am just not used to that type of presentation from people who are supposed to be professionals.* Now, let's go down the exhibits right now.

MR. WOOD: *Your Honor, I want to put it on the record—*

THE COURT: I said you can put it in writing. But *you are not going to take up my time and the time of this jury right now on something which I think is completely frivolous.* [Emphasis added.]

We recognize, of course, that a trial court has broad discretion when ruling on the relevance of evidence. As a result, a "trial court's decision that proffered evidence is not sufficiently relevant or probative is reviewable only for an abuse of discretion." *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983) (citation omitted), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). But an uninformed exercise of discretion is likely to be an abuse of discretion. "To exercise its judgment in a rational and informed manner, the trial court should be apprised of all relevant factors pertaining to the pending decision." *Johnson v. United States, supra,* 398 A.2d at 365 (citation omitted). The trial court in this case, by refusing even to hear defense counsel's proffer, exercised its discretion in a vacuum.

Surely, a trial court must understand the theory on which evidence is offered in order to judge its admissibility. The supplier of such a theory is almost always the proffering attorney. In *McBride v. United States,* 441 A.2d 644 (D.C.1982), we noted that "[w]hen a trial court balks at admitting certain evidence, counsel normally should make an offer of proof. A proffer helps the court determine admissibility...." *Id.* at 656 (citations omitted). In the present case, however, the trial court repeatedly rebuffed defense counsel's efforts to explain the relevance of the questions to which the prosecutor had objected. As a result, the trial court made its rulings without an understanding of the reasons why the questions were being asked, an understanding that defense counsel vainly attempted to provide. We hold that the court's refusal even to hear defense counsel's proffers was error.

The government argues that the questions which defense counsel wanted to ask Baker and Mines were only "marginally relevant," so that the court's error was harmless. We cannot agree. These questions went to the heart of the defense case. As counsel explained in his motion for mistrial, filed on the morning of the fourth day of trial, he was trying to cast doubt on Baker's testimony that he had been carrying more than a thousand dollars in his pocket and that the money was intended to pay for repairs to his car. Had he been successful, the jury might well have accepted the defense claim that Baker had fabricated his account of the robbery. The court, however, denied the mistrial motion, calling it a "stall." That denial not only compounded the court's earlier error in refusing to allow counsel to state his reasons for asking certain questions, but also interfered with Hollingsworth's due process right to establish a defense. *See Chambers v. Mississippi,* 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973); *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). We therefore hold that the court's refusal to hear counsel's proffers resulted in substantial prejudice to Hollingsworth's de-

fense, which can be remedied only by a new trial.

**V**

Finally, Hollingsworth contends that the trial court erred in denying his motion under Super.Ct.Crim.R. 14 to sever the robbery charge from the weapons charges. Such motions are committed to the sound discretion of the trial court. We find no abuse of discretion.

■■■ We have often stated that if evidence of one offense is admissible in a separate trial for another offense, joinder of those offenses is permissible because no prejudice can result from the joinder. *E.g., Byrd v. United States,* 502 A.2d 451, 452 (D.C.1985) (citing cases); *Bridges v. United States,* 381 A.2d 1073, 1075 (D.C.1977), *cert. denied,* 439 U.S. 842, 99 S.Ct. 135, 58 L.Ed.2d 141 (1978). In the present case, the evidence supporting the weapons charges would certainly have been admissible at a separate trial for the armed robbery. Baker testified that the gun recovered by the police on March 24, an unusual snubnosed and hammerless .38 caliber revolver, was the same one that the robber pointed at him on February 15. That testimony was sufficient to make the gun and its accompanying ammunition admissible on the armed robbery charge. *Adams v. United States,* 379 A.2d 961, 964 (D.C. 1977); *United States v. Jackson,* 166 U.S. App.D.C. 166, 175 n. 73, 509 F.2d 499, 508 n. 73 (1974); *United States v. Knight,* 166 U.S.App.D.C. 21, 25, 509 F.2d 354, 358 (1974); *see United States v. Thornton,* 149 U.S.App.D.C. 203, 205, 462 F.2d 307, 309 (1972).

Whether evidence of the robbery would be admissible in a separate trial for the weapons offenses is a more difficult question. We need not decide it, however, because we can uphold the denial of severance on the alternative ground that "the evidence as to each offense [was] separate and distinct, and thus unlikely to be amalgamated in the jury's mind into a single inculpatory mass...." *Bridges v. United*

*States, supra,* 381 A.2d at 1075.[15] The evidence in this case passes that test. The testimony about each offense was simple and straightforward, and for the most part the evidence was presented in clear chronological order.[16] Although the trial judge did not specifically instruct the jury to consider each offense separately from the others,[17] as he probably should have done,[18] we are satisfied, after reviewing the entire record, that the jury could not reasonably have been confused or misled into believing that the person who committed the February 15 offense must have committed the March 24 offenses as well. The record likewise offers no support for the suggestion that Hollingsworth was embarrassed or confounded in presenting his defenses to the various charges. The defense evidence relating to the events of each date was presented separately and discretely, and at no time did either of Hollingsworth's able attorneys show any signs of confusion or embarrassment in putting his defense before the jury. For these reasons we hold that the court did not abuse its discretion in denying the motion for severance.

## VI

With the exception of the severance argument, which we have discussed in part V, all of Hollingsworth's assignments of error relate solely to his armed robbery conviction. The only contention that might arguably be read as applying also to the pistol and ammunition convictions is his claim that the trial court's "persistent criticism of defense counsel and the defense case" so unnerved and humiliated his counsel "that they could not devote their best talents to the defense of their client." The record refutes this argument. Hollingsworth was represented at trial by two attorneys from the Public Defender Service. Even in the face of comments by the court which the government in its brief tactfully describes as "tart and undiplomatic," they provided representation of the highest quality to their client. Our review of the record convinces us that counsel were not "thrown off balance"[19] or otherwise rendered ineffective by anything the trial court did. *See Robinson v. United States,* 513 A.2d 218, 221 (D.C.1986). The evidence relating to the pistol and ammunition charges was fairly strong, and Hollingsworth's defense was weak.[20] We are satisfied that nothing the court said or did in its dealings with defense counsel had any adverse effect on the verdict on these charges.

## VII

For the reasons set forth in parts II, III, and IV of this opinion, Hollingsworth's conviction of armed robbery is reversed; his other convictions, however, are affirmed. This case is remanded for a new trial on the charge of armed robbery.

*Affirmed in part, reversed and remanded in part.*

**15.** Our cases make clear that if the denial of severance can be sustained on either ground, we will not find prejudicial joinder. *E.g., Arnold v. United States,* 511 A.2d 399, 405 (D.C.1986); *Crisafi v. United States,* 383 A.2d 1, 3 n. 3 (D.C.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 322, 58 L.Ed.2d 326 (1978).

**16.** The one government witness who testified out of order was Earl Mines, the mechanic who was supposed to repair Hollingsworth's car. He was the last government witness, but his testimony was brief and did not relate in any way to the events of March 24. We do not see how it could have adversely affected the defense in any respect.

**17.** Criminal Jury Instructions for the District of Columbia, No. 2.50 (3d ed. 1978).

**18.** *See Arnold v. United States, supra* note 15, 511 A.2d at 405.

**19.** *Womack v. United States,* 350 A.2d 381, 383 (D.C.1976).

**20.** Four police officers testified about Hollingsworth's arrest on March 24 and the concurrent seizure of the pistol and ammunition. Two defense witnesses testified only that they were present when Hollingsworth was searched, and that they did not see the police recover a gun from him. Hollingsworth himself did not testify at all.