*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 23-CF-0205 & 23-CF-0229

RONNIKA M. JENNINGS & DEREK BRIAN TURNER, APPELLANTS,

V.

UNITED STATES, APPELLEE.

Appeals from the Superior Court
of the District of Columbia
(2018-CF1-006028 & 2017-CF1-015352)

(Hon. Marisa J. Demeo, Trial Judge)

(Argued October 16, 2025                    Decided February 26, 2026)

*Matthew Martens*, with whom *Zachary Halpern*, *Paul Piazza*, and *Leah Fugere* were on the briefs, for appellant Ronnika M. Jennings.

*Madeleine Joseph*, with whom *Tobias S. Loss-Eaton*, *Scott Lowder*, *Abigail Scheper*, and *Susan Whaley* were on the briefs, for appellant Derek Brian Turner.

*Elizabeth Gabriel*, Assistant United States Attorney, with whom *Jeanine Ferris Pirro*, United States Attorney, and *Chrisellen R. Kolb*, *Daniel J. Lenerz*, and *Michael Truscott*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and SHANKER, *Associate Judges*, and THOMPSON, *Senior Judge*.

SHANKER, *Associate Judge*: A violent feud between residents of the Southeast

D.C. neighborhoods of Wahler Place and Trenton Park left three individuals dead

and several more injured over the course of ten months in 2016 and 2017. Appellants Derek Brian Turner and Ronnika Jennings were charged with dozens of offenses related to these events. Following a jury trial, Mr. Turner was convicted of committing two murders, multiple assaults, an array of firearm offenses, and several obstruction of justice offenses. Ms. Jennings, a Metropolitan Police Department (MPD) employee, was acquitted of her most serious charges but was convicted of being an accessory after the fact (AAF) and obstructing justice for using her position within the police department to assist Mr. Turner in the wake of his crimes. We affirm Mr. Turner's convictions for the murders, assaults, and related firearm offenses because they rest on solid evidentiary and constitutional ground. The government, however, presented insufficient evidence to support Ms. Jennings's AAF convictions, so those must be reversed. In addition, we agree with all parties that both appellants' obstruction of justice convictions must be vacated.

## I. Background

### A. Summary

The string of violent incidents between residents of the Wahler Place and Trenton Park neighborhoods began in May 2016. Shootings that occurred on January 7, February 17, and March 1, 2017, however, form the core of this case. The first incident left its target, Devin Hall, dead. The second left a bystander injured

but its two main targets unscathed.  The third left Andrew McPhatter, one of the uninjured targets of the February 17 shooting, dead.  In the days after each of these incidents, Mr. Turner called Ms. Jennings on the phone, and Ms. Jennings ran a search in an MPD database for information related to each incident before calling Mr. Turner back.

The next stage of this case began on March 8, when police temporarily seized and then searched Mr. Turner's car after Mr. Turner was the target of an attempted drive-by shooting.  This search led to evidence connecting Mr. Turner to the three shooting incidents mentioned above—including a gun likely used in the shootings— and he was arrested.  His two cell phones were also seized and then searched.  Thereafter, Mr. Turner and several associates planned to pin ownership of the gun on someone else.

Mr. Turner and Ms. Jennings were eventually indicted for participating in the violent feud between residents of the two neighborhoods.  Following pretrial challenges seeking to suppress evidence against them and an eleven-week trial, a jury convicted Mr. Turner of most of the charges against him and acquitted Ms. Jennings of all but five of the charges she faced.

**B.      The Feud Between Residents of Wahler Place and Trenton Park**

In May 2016, a resident of Wahler Place was murdered.  The next day, Mr. Turner, also a Wahler Place resident, was shot nearby.

Two months later, a Trenton Park resident was shot.  Later that same day, Mr. Turner, a female associate, and another Wahler Place resident named Antwan Jones were the targets of a shooting near Wahler Place.  Mr. Jones suffered non-fatal gunshot wounds, while the other two escaped mostly unharmed.  That same night, a hail of gunfire disrupted a large social gathering in a parking lot near the Trenton Park neighborhood, leaving two wounded and damaging several cars.

A month after that, in August 2016, several Trenton Park residents appeared in a video posted on YouTube (the "parking lot video") in which they referenced the parking lot shootout.  A video later discovered on Mr. Turner's phone showed Mr. Turner and another Wahler Place resident sitting in a car while the other Wahler Place resident made statements responding to the August 2016 parking lot video.

On November 23, 2016, a shooting took place at Wheeler Market, a corner store near Wahler Place.  Mr. Turner was wearing a GPS tracking device at the time in connection with a different matter, and the GPS tracking data showed his device near Wheeler Market around the time of the shooting.

That same day, after the Wheeler Market incident, Mr. Turner twice called Ms. Jennings, an MPD station clerk. Mr. Jones, who was Mr. Turner's Wahler Place associate and Ms. Jennings's longtime friend, had introduced Mr. Turner to Ms. Jennings. Ms. Jennings worked in a Southeast D.C. police district, where she primarily helped members of the public with requests for information.

As part of her job, Ms. Jennings had access to Cobalt, MPD's internal records-management system, along with the Washington Area Law Enforcement System (WALES) and National Crime Information Center (NCIC) databases, which contain police information from other sources. Although members of the public cannot access any of these databases, station clerks like Ms. Jennings can use Cobalt to generate a "public packet" of certain information—such as a police report documenting a burglary intended for use in an insurance claim—suitable for public disclosure. Cobalt's "internal packet," by contrast, contains more sensitive information, including the "sources, methods, [and] witnesses" associated with a particular investigation. On the day of the Wheeler Market shooting, Ms. Jennings accessed a Cobalt report for that incident ten minutes after Mr. Turner called her.

### C. The January 7, February 17, and March 1, 2017, Shootings

Shortly after the New Year, on January 7, 2017, a Trenton Park resident named Devin Hall was shot to death in his car. One witness told 911 that the

shooter—one person—had gotten out of a white Lexus bearing paper tags, shot the victim, and fled in the same white Lexus. Another witness, Sharon Mouton, described seeing a "white, tan-ish" "Pontiac-ish vehicle" in the parking lot where the shooting took place. At the time, Mr. Turner owned and drove a white Lexus.

Ms. Mouton saw two people get out of the car and start shooting, then drive quickly away. Ms. Mouton identified one shooter as "heavy-set" and "light skinned-ish" and the other as having "brown" skin and wearing dreadlocks. Mr. Jones, one of the victims in the July 2016 shooting along with Mr. Turner, weighed between 250 and 260 pounds. Mr. Turner wore dreadlocks at the time. Police recovered .40 caliber and 10 millimeter shell casings from the scene of the murder. Two cell phones later recovered from Mr. Turner had pinged a cell tower 0.2 miles from the shooting minutes after the shooting took place.

Mr. Turner was still on GPS monitoring at the time of the Devin Hall murder, and his GPS data from that day showed the GPS device located close to Mr. Turner's home around the time of the murder. Weeks earlier, however, on December 18 and December 23, data from Mr. Turner's GPS device showed that it was at Mr. Turner's home, but Mr. Turner was captured on video at a different location at that same time. At trial, the government's GPS expert opined that publicly available information exists on how to "defeat a GPS device."

Mr. Turner and Ms. Jennings exchanged phone calls in the days and weeks following the shooting, on January 8, 12, 15, and 23. After some of these calls, Ms. Jennings searched for Mr. Turner's name in WALES and NCIC.

In February 2017, three shootings took place near the Trenton Park neighborhood. First, on February 16, 2017, a Trenton Park resident was shot at by an individual who emerged from a "beige" or "golden" car. Two hours later, Ms. Jennings viewed the police report for the shooting.

Second, on February 17, 2017, Trenton Park residents Andrew McPhatter, Raheem Osborne, and a bystander, Joseph Tyler, were the victims of a shooting. Mr. McPhatter and Mr. Osborne were driving in Mr. McPhatter's car when Mr. Osborne noticed a white car following them. Mr. Osborne later described the car as a "white Honda-style vehicle, two-door, with paper tags," which he also characterized as a "Honda Accord." Minutes later, when Mr. McPhatter and Mr. Osborne parked the car and got out, a man emerged from the white car and began shooting at them using a black semi-automatic firearm. The man wore dreadlocks and a mask. Mr. McPhatter fired back using his own gun, and he and Mr. Osborne fled. Mr. McPhatter was uninjured, but Mr. Osborne was hit in the thigh, and Mr. Tyler was hit in the face and arm.

Minutes before the shooting, one of Mr. Turner's cell phones pinged a cell tower in the area. Police recovered casings from 10 millimeter and .40 caliber bullets at the scene. Three days after the shooting, Mr. Turner called Ms. Jennings. The day after that, on February 21, Ms. Jennings viewed the police report in Cobalt for the February 17 shooting.

Third, on February 22, 2017, three Trenton Park residents were the victims of a shooting in the area around 10th Street and Alabama Avenue, Southeast. Nine minutes after this shooting, Mr. Turner texted Mr. Jones, "[C]heck your local news, boy." Mr. Turner called Ms. Jennings two hours later, and Ms. Jennings searched Cobalt for the police reports pertaining to the February 17 and 22 shootings the next morning. The two spoke by phone on February 23 and February 26.

On the morning of March 1, 2017, Mr. McPhatter was shot to death at the intersection of Wheeler Road and Upsal Street, Southeast. Security footage showed Mr. McPhatter in his car driving down Upsal Street, followed minutes later by a white vehicle. After the shooting, two witnesses observed a white car leaving the area in which the crime was committed at a "high rate of speed." Mr. Turner's cell phones pinged a nearby cell tower around the time the shooting took place. The police recovered 10 millimeter bullet casings from the scene.

Minutes after Mr. McPhatter was shot, Mr. Turner called Ms. Jennings. The two exchanged calls over the next several hours. On March 2, Ms. Jennings searched Cobalt for the police report corresponding to the shooting of Mr. McPhatter, and she and Mr. Turner spoke on the phone later that day. Mr. McPhatter died on March 5. On March 6, Mr. Turner and Ms. Jennings spoke on the phone.

### D. The Searches of Mr. Turner's Car and Cell Phones

On March 8, 2017, Mr. Turner was the target of a drive-by shooting in front of a Court Services and Offender Supervision Agency (CSOSA) office in Southeast D.C. Mr. Turner had driven his white Lexus to the CSOSA office earlier that day, and other individuals were seen getting into and out of the car. Mr. Turner, accompanied by his associate Arman Johnson, was walking from the CSOSA office in the direction of his white Lexus when gunfire erupted from a gold Ford Explorer that had been observed rolling by the CSOSA office a half hour earlier. No one was hit, but four cars parked along the street, including Mr. Turner's Lexus, were struck by bullets.

Mr. Turner initially left the scene, and police rebuffed an unidentified woman's attempt to gain access to Mr. Turner's vehicle and retrieve some items inside. Police received consent from the owners of the other three cars to conduct a search at the scene; when Mr. Turner returned to the scene, he declined to consent

to a search of his Lexus. Officers did not search the car at that time, but they towed it to the secure garage of the Department of Forensic Sciences for later processing. When Mr. Turner learned of this, he was "distraught." That evening, Mr. Turner spoke to Ms. Jennings on the phone for twenty-four minutes.

Police obtained two search warrants related to Mr. Turner's Lexus. The first warrant authorized a search of the vehicle for bullet fragments, casings, electronic devices, and writings related to the identities of those targeted in the shooting and the unidentified woman who attempted to access the Lexus before it was seized. While conducting this first search, police found a 10 millimeter Glock handgun in the Lexus's locked glove compartment, which prompted them to halt the search temporarily. They then obtained a second warrant, which included authorization to fully process and test the firearm along with authorization to search the car for related items. In addition to the gun, police ultimately found and seized paper shooting targets, a Maryland paper license plate, parking tickets, mail addressed to Mr. Turner, insurance cards and credit cards in Mr. Turner's name, a copy of the vehicle's registration listing Mr. Turner, and a mask with Mr. Turner's DNA on it.

A government firearms expert examined the 10 millimeter bullet casings found at the scenes of the January 1, 2017, murder of Hall, the February 16, 17, and 22, 2017, assaults (including the assaults of Mr. McPhatter, Mr. Osborne, and

Mr. Tyler), and the March 1, 2017, murder of Mr. McPhatter, and at trial provided his opinion that they had been identified as having been fired from the Glock found in Mr. Turner's Lexus. DNA was found on the gun, but a government forensic expert determined that the DNA came from "at least two individuals" and the results of DNA testing were "inconclusive" as to Mr. Turner: his DNA could not be ruled in or out.

Police arrested Mr. Turner for unlawful possession of the Glock found in his vehicle. They seized two cell phones belonging to Mr. Turner during a search incident to the arrest. Police obtained the first of two sets of search warrants to search these phones that same day in March 2017, but these initial searches yielded no data. Nearly six months later, in September 2017, police obtained a second set of search warrants for the phones; this time, they were able to extract the phones' data.

That data showed that on the day after Mr. Turner's arrest, Mr. Jones texted Ms. Jennings: "Hey Nik, man, they say he in district court, can you check for me and see what they got[?]" Mr. Jones and Ms. Jennings engaged in several calls that day.[1] On March 14, 2017, Mr. Turner was indicted in federal court on a felon-in-

---

[1] Mr. Jones died two weeks later.

possession charge for the handgun found in his car. In a series of recorded jail calls, Mr. Turner developed a plan for a girlfriend, Marshay Hazelwood, to falsely claim ownership of the gun.[2]

During this planning period, Mr. Turner referred to Ms. Jennings, or communicated with her, several times. On May 13, 2017, Mr. Turner spoke with Ms. Hazelwood and Ms. Jennings in a three-way call. Mr. Turner told Ms. Jennings that he wanted Ms. Hazelwood to meet her and that Ms. Jennings should "just let her know." Later that day, Mr. Turner told Ms. Hazelwood:

> Make sure you go see Nik . . . Let her know just give you the run down on everything, . . . on everything and everybody. . . . I don't want you to talk to her over the junk. . . . Talk to her in person. . . . Tell her what I need.

Two weeks later, Ms. Hazelwood told Mr. Turner that she was getting ready to meet "Nik." Shortly thereafter, Mr. Turner and Ms. Hazelwood spoke again, and the following exchange took place:

---

[2] Something like this had happened before. A Wahler Place resident named Jerrad Childs (nicknamed "Heavy") claimed ownership of a firearm, allowing a second Wahler Place resident named Sukarno Turner—of no relation to Derek Turner—to secure a favorable verdict in a felon-in-possession case against him in federal court. Derek Turner appears to have referenced this incident in a jail call with Sukarno Turner, saying that he was going to "work it the same way Heavy worked it."

Turner: Everything alright?

Hazelwood: Yeah.

Turner: She said it?

Hazelwood: Yeah.

Turner: What, they fishin'?

Hazelwood: No.

Turner: Huh?

Hazelwood: I said she said no. . . . Double check. Nothing right now.

Turner: What, like, I ain't never come up?

Hazelwood: Uh-uh.

Turner: Y'all just made my day.

Hazelwood: Mine too.

Turner: Text her and tell her I said I send my love, man. Tell her I'm on the phone right now.

Shortly after, Ms. Hazelwood texted Ms. Jennings, "He said he sent his love," and Ms. Jennings replied, "Tell him me . . . too." On September 6, 2017, police arrested Mr. Turner for Mr. McPhatter's murder. Ms. Jennings accessed the police report in Cobalt for Mr. McPhatter's shooting five times that day, all after Mr. Turner was arrested. Ms. Hazelwood also texted Ms. Jennings that day, asking, "Can you keep me updated with anything else?" Ms. Jennings responded, "I sure will."

## E.     Procedural History

Mr. Turner, Ms. Jennings, Ms. Hazelwood, and another Wahler Place resident named Duan Hill were indicted for their alleged involvement in the events stretching from November 2016 to September 2017.[3]  Mr. Turner was charged with thirty-nine offenses.  Ms. Jennings was charged with forty-five offenses.

Both Mr. Turner and Ms. Jennings moved to suppress certain evidence. Mr. Turner moved to suppress the items gathered in the search of his Lexus on the ground that the initial warrantless seizure of the car violated the Fourth Amendment. He argued, in relevant part, that he was "not a suspect, but a victim of a drive-by shooting," and that police had no "reason to believe the vehicle contained evidence of criminality."  After a hearing, the trial court denied the motion in a ruling from the bench.  The court found that officers had probable cause to believe that evidence related to the drive-by shooting would be found in Mr. Turner's car, and that this

---

[3] Ms. Hazelwood died before trial.  Mr. Hill was charged with conspiracy to obstruct justice and six counts of obstruction of justice, and the jury found him guilty of the conspiracy and two obstruction of justice counts.  Mr. Hill initially appealed his convictions alongside Ms. Jennings and Mr. Turner, but the government later filed an unopposed motion to vacate Mr. Hill's convictions and remand for the dismissal of his indictment, which we granted. *See Hill v. United States*, No. 23-CF-255, Order at \*1-2 (March 27, 2025) (per curiam).  Accordingly, Mr. Hill is no longer involved in this appeal. *See id.*

probable cause was sufficient for police to seize the vehicle temporarily before obtaining a warrant to search it.

Separately, Mr. Turner moved to suppress evidence gathered from the searches of his two cell phones, contending that the March 2017 and September 2017 warrants were facially deficient. Citing *Burns v. United States*, 235 A.3d 758 (D.C. 2020), he argued that the warrants were overbroad and not based on probable cause. The trial court denied as moot the motion to suppress relating to the March phone warrants, because the search authorized by those warrants yielded no data. It also denied the motion to suppress relating to the September warrants, finding that the affidavits attached to those warrant applications adequately established probable cause and that the warrants were sufficiently particularized. In the alternative, the trial court found that the good-faith exception to the exclusionary rule applied to evidence obtained through the searches authorized by the September warrants.

Ms. Jennings moved to suppress statements from a January 2018 interview with the police, along with the contents of a cell phone she handed over during that interview. After a hearing, the trial court denied Ms. Jennings's motions.

The case proceeded to trial, which stretched for eleven weeks during the fall of 2022. The jury found Mr. Turner guilty of twenty-two offenses: conspiracy to kill, assault, and destroy property of the Trenton Park crew; first-degree murder,

possession of a firearm during a crime of violence, and possession of a firearm by a convicted felon for the January 7, 2017, killing of Devin Hall; three counts of assault with intent to kill, two counts of possession of a firearm during a crime of violence, and one count of possession of a firearm by a convicted felon for the February 17, 2017, assaults of Mr. Osborne, Mr. McPhatter, and Mr. Tyler; first-degree murder, possession of a firearm during a crime of violence, and possession of a firearm by a convicted felon for the killing of Mr. McPhatter on March 1, 2017; possession of a firearm by a convicted felon on March 8, 2017; obstruction conspiracy; and seven counts of obstruction of justice. The jury found Ms. Jennings guilty of five offenses: three counts of AAF for Mr. Turner's February 17 assaults on Mr. Osborne, Mr. McPhatter, and Mr. Tyler; one count of AAF for Mr. Turner's March 1 murder of Mr. McPhatter; and one count of obstruction of justice.

These appeals followed.

## II.    Standards of Review

We review a challenge to the sufficiency of the evidence de novo. *Bailey v. United States*, 257 A.3d 486, 492 (D.C. 2021). "The evidence is sufficient if any rational fact-finder could have found the elements of the crime beyond a reasonable doubt." *Sanders v. United States*, 330 A.3d 1013, 1032 (D.C. 2025) (quoting *White v. United States*, 207 A.3d 580, 587 (D.C. 2019)). In addressing a sufficiency

challenge, we view the evidence in the light most favorable to the verdict, giving "full play" to jury determinations about credibility, the weight of the evidence, and which reasonable inferences to draw from the facts presented. *Id.* (quoting *White*, 207 A.3d at 587). "No distinction is made between direct and circumstantial evidence" when reviewing a sufficiency claim. *Mitchell v. United States*, 64 A.3d 154, 157 (D.C. 2013).

Although "the government bears the burden of presenting sufficient evidence," the government need not "negate every possible inference of innocence." *Cherry v. District of Columbia*, 164 A.3d 922, 929 (D.C. 2017) (quoting *Brooks v. United States*, 130 A.3d 952, 959 (D.C. 2016)). Even so, we "must consider all of the evidence, including that favorable to the defendant." *Schools v. United States*, 84 A.3d 503, 508 (D.C. 2013). "We consider all evidence admitted by the trial court," even if it was admitted erroneously, "when conducting a sufficiency review." *Ransom v. United States*, 322 A.3d 521, 527 (D.C. 2024) (quoting *Morales v. United States*, 248 A.3d 161, 185 (D.C. 2021)).

When reviewing a ruling on a motion to suppress, "we accept the trial court's findings of fact unless they are clearly erroneous, and we review the facts and reasonable inferences therefrom in the light most favorable to the prevailing party." *United States v. Bumphus*, 227 A.3d 559, 563-64 (D.C. 2020) (citation modified).

We review the trial court's legal conclusions de novo. *Mayo v. United States*, 315 A.3d 606, 616 (D.C. 2024) (en banc).

Although Mr. Turner and Ms. Jennings formally challenge the sufficiency of the evidence for their obstruction of justice convictions, their arguments actually present "issues of statutory construction," which are legal questions that we address de novo. *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012).

## III.    Issues Raised by Mr. Turner

Mr. Turner challenges his convictions for the crimes of January 7, February 17, and March 1, 2017, on several fronts. First, he argues that the government presented insufficient evidence to convict him of these offenses. Second, he asserts that his convictions should be vacated because the March 8, 2017, seizure of his car violated the Fourth Amendment. Third, he claims that the warrant authorizing the search of his two cell phones did not satisfy the Fourth Amendment's Warrant Clause. We reject these arguments and affirm these convictions.

### A.    Sufficient Evidence Supports Mr. Turner's Convictions for the January 7, February 17, and March 1, 2017, Offenses.

Mr. Turner argues that the government presented insufficient evidence with respect to the January 7, February 17, and March 1 murder, assault with intent to kill, possession-of-a-firearm-during-a-crime-of-violence, and felon-in-possession

offenses. He primarily focuses on two aspects of the government's case. First, he argues that the government did not place him at the scene of any of the crimes because the eyewitness testimony the government presented was inconsistent and vague. Second, he argues that the government did not sufficiently link him to the gun found in his Lexus, and that because others may have had access to the gun, the government did not prove beyond a reasonable doubt that he, rather than one of his compatriots, used the gun to commit the crimes for which he was convicted. He also suggests that the government's "consciousness of guilt" evidence was weak and that the evidence is insufficient even if considered cumulatively.

Viewing the evidence in the light most favorable to the verdict, as we must, we conclude that there was sufficient evidence to convict Mr. Turner for the offenses of January 7, February 17, and March 1, 2017. We examine the evidence for each incident in turn.

### 1. *January 7 Shooting of Devin Hall*

At trial, the government presented the following relevant evidence. Witnesses described the vehicle at the scene as a "white Lexus with paper tags" and a "white, tan-ish" "Pontiac-ish vehicle." Mr. Turner owned and drove a white Lexus in which a paper Maryland license plate was later found by the police.

One witness testified that there was one shooter, while another testified there were two. Both witnesses agreed that there were at least two people in the car from which the shots originated. The witness who saw two shooters testified that one of them was brown-skinned, of average build, and wore dreadlocks. This description matched Mr. Turner's appearance at the time. Historical cell site location information (CSLI) showed that the two cell phones later recovered from Mr. Turner were in the coverage area of a cell tower located 0.2 miles from the scene of the shooting mere minutes after the shooting took place.

Police recovered .40 caliber and 10 millimeter shell casings from the scene of the murder, and a forensics expert later testified that, in his opinion, the 10 millimeter cartridges were fired from the Glock found in the locked glove box of Mr. Turner's Lexus. The Lexus contained evidence that Mr. Turner used the car regularly. Beyond the fact that the car was titled to him, police found, in the center console, mail addressed to him, insurance information with his name on it, and credit cards in his name, all within easy reach of the driver.

In addition, the government presented evidence that Mr. Turner contacted Ms. Jennings the day after the murder, and again on January 12, 15, 17, and 23. On January 17, after Ms. Jennings ran additional searches for Mr. Turner, she texted

him, "You still good"; Mr. Turner replied, "Ok, thank you"; and Ms. Jennings responded, "LMAO."

In all, the government presented evidence that a person with Mr. Turner's hairstyle and build, who was in a car resembling Mr. Turner's, and who was using a gun that, in the opinion of the government's forensic expert, matched the one found in the locked glove box of Mr. Turner's car, committed the January 7, 2017, shooting of Devin Hall. Moreover, the evidence showed that Mr. Turner's cell phones were near the location of the shooting shortly after it took place. A jury could further infer from Mr. Turner's contact with Ms. Jennings in the days after the murder, and particularly their text exchange on January 17, that he was interested in his status as a suspect in the crime. *Cf. Ferguson v. United States*, 977 A.2d 993, 1001 (D.C. 2009) (holding that post-crime evidence of steps defendant took to avoid detection was admissible to show consciousness of guilt); *Moore v. United States*, 757 A.2d 78, 83 (D.C. 2000) (concluding that defendant's "suspicious denial that he was not driving a stolen car" supported an inference of consciousness of guilt). From this constellation of evidence, the jury could reasonably conclude, beyond a reasonable doubt, that Mr. Turner, and not someone else, committed the murder and the associated firearm offenses. *See Sanders*, 330 A.3d at 1032.

Mr. Turner attempts to undermine several key pillars of the government's case. First, he points to evidence that his GPS monitoring device was located at his home when the shooting took place. But the government presented evidence that Mr. Turner had seemingly slipped the restraints of his GPS tracking device on another occasion. More importantly, it presented historical CSLI evidence placing Mr. Turner's two phones near the shooting around the time it took place.

Mr. Turner also attacks the vehicle identification, arguing that one witness's description of the vehicle as "tan-ish" and "Pontiac-ish" fatally undermines an inference that Mr. Turner's white Lexus was present at the scene. But the other witness described the car as a white Lexus with paper tags, and the description of the vehicle as "white," "tan-ish," and "Pontiac-ish" is not inconsistent with a white Lexus with paper tags because that witness used the word "white" and qualified the other descriptors ("-ish").

Finally, Mr. Turner argues that the government presented insufficient evidence linking him to the gun because, on the day the gun was recovered from the car, other individuals were seen in the car. But the government presented evidence, in the form of mail, parking tickets, and financial documents in Mr. Turner's name, that Mr. Turner regularly used the car, which he owned. And no evidence suggested that a person other than Mr. Turner had access to the locked glove box. *Cf. Rivas v.*

*United States*, 783 A.2d 125, 131 (D.C. 2001) (explaining that a non-owner passenger's physical proximity to contraband is of limited probative value when determining whether they constructively possessed that contraband).

In essence, Mr. Turner argues that the jury should have focused its attention on supposed inconsistencies and gaps in the government's case. But as long as the government offered "some probative evidence on each essential element of the crime," *Rollerson v. United States*, 127 A.3d 1220, 1232 (D.C. 2015), minor inconsistencies or differences in testimony "generally affect only the weight of the evidence, not its sufficiency, and are . . . for the [jury] to resolve," *Ransom*, 322 A.3d at 527 (citation modified). Put another way, the jury could reasonably have resolved each of these supposed inconsistencies in the government's favor by drawing "justifiable inferences" from the evidence presented. *Cherry*, 164 A.3d at 929 (quoting *Brooks*, 130 A.3d at 955). These could include, for example: crediting the government's testimony about Mr. Turner's ability to "defeat" his GPS device; concluding that Mr. Turner used the 10 millimeter gun in the January 7 shooting because that gun was found in the locked glove box of the car he regularly used; and concluding that the vehicle described as "white" (twice), "tan-ish," and "Pontiac-ish" was Mr. Turner's white Lexus. Because the jury could permissibly draw each of these inferences, and because the cumulative force of the circumstantial evidence viewed in this manner was enough for the jury to find that Mr. Turner committed the

January 7 shooting, we conclude that the evidence was sufficient for a jury to find Mr. Turner guilty of murder, possession of a firearm during a crime of violence, and possession of a firearm by a convicted felon beyond a reasonable doubt. *See id.*[4]

### 2. *February 17 Shootings of Raheem Osborne, Andrew McPhatter, and Joseph Tyler*

The government presented evidence that Mr. McPhatter and Mr. Osborne were ambushed by a person wearing dreadlocks and a mask who emerged from a white car and began shooting at them. Mr. Osborne described the car as a "white Honda-style vehicle, two-door, with paper tags," which he also characterized as a

---

[4] After oral argument, Mr. Turner filed a letter with the court invoking D.C. Court of Appeals Rule 28(k), which permits a party to advise the court of "pertinent or significant authorities" that have "come to a party's attention after . . . oral argument but before decision." D.C. App. R. 28(k). The rule requires a party to "state without argument the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally." *Id.* In his filing, Mr. Turner raised a new argument prompted by a question at oral argument: that the trial court should not have admitted the ballistics evidence at trial. But "we generally do not consider arguments raised for the first time at oral argument," *Bare v. Rainforest All., Inc.*, 336 A.3d 619, 624 n.1 (D.C. 2025) (citation modified); *see Fort Myer Constr. Corp. v. Briscoe*, 298 A.3d 770, 778-79 (D.C. 2023) (per curiam), much less arguments raised for the first time in a Rule 28(k) letter filed after argument, *see Keerikkattil v. United States*, 313 A.3d 591, 611 (D.C. 2024) ("In general, parties may not exploit Rule 28(k) by raising new arguments outside their briefs, particularly when those arguments do not rely on subsequent legal authority.") (citation modified). Therefore, we decline to consider this argument. We note, in any event, that we consider erroneously admitted evidence for sufficiency purposes, *see Ransom*, 322 A.3d at 527, so Mr. Turner's argument would not alter our resolution of his sufficiency claim.

"Honda Accord." Historical CSLI showed that minutes before the shooting, one of Mr. Turner's cell phones pinged a cell tower in the area. Police recovered casings from 10 millimeter bullets at the scene, and a forensic expert testified that, in his opinion, those bullets were fired from the gun found in Mr. Turner's Lexus. Three days after the shooting, Mr. Turner called Ms. Jennings, and he called her again on February 23 and 26 after she searched in Cobalt for the shooting.

This evidence is sufficient to support Mr. Turner's convictions for the offenses on February 17 because it showed that a person wearing a mask, with a hairstyle similar to Mr. Turner's, who was driving a car like Mr. Turner's, who likely carried one of Mr. Turner's cell phones, and who was using the gun an expert opined was the same as the one found in the locked glove box of Mr. Turner's car committed the February 17 shootings. A mask with Mr. Turner's DNA on it was found in Mr. Turner's Lexus. In addition, Mr. Turner's contact with Ms. Jennings in the days after the crimes suggests he was interested in the investigation into these shootings. *See Ferguson*, 977 A.2d at 1001. From this evidence, the jury could reasonably conclude, beyond a reasonable doubt, that Mr. Turner committed the assaults with intent to kill and associated firearm offenses. *See Cherry*, 164 A.3d at 929.

As with the Hill shooting, Mr. Turner raises similarly unpersuasive arguments in response to this evidence. He highlights Mr. Osborne's characterization of the

car as a "Honda Accord" to suggest that Mr. Turner's car could not have been on the scene that day. But the record, when viewed in the light most favorable to the verdict, permits a different conclusion. *See Sanders*, 330 A.3d at 1032. Mr. Osborne first stated that the car was "a white Honda-style vehicle, two-door with paper tags," which he later firmed up as a "Honda Accord." True, these are inconsistent descriptions: a "Honda-style vehicle" can include vehicles of different makes, while a "Honda Accord" is just that. But in light of the rest of the description—white, two doors, paper tags—and considering the rest of the circumstantial evidence connecting Mr. Turner to these crimes, a reasonable jury could conclude that Mr. Osborne described Mr. Turner's white Lexus. *See Gray v. United States*, 147 A.3d 791, 805 n.12 (D.C. 2016) (explaining that the jury was permitted to "resolve any discrepancies" about an accomplice's identity "in favor of the government" where two witnesses testified that the accomplice's shirt was dark in color and one testified it was light blue).

Mr. Turner also takes issue with the gun-related identification evidence, making the same argument he does for the January 7 shooting. That argument is unsuccessful for the reasons discussed above. *Supra* Part II.A.2.a.

Mr. Turner further argues that the government presented insufficient evidence that Mr. Tyler was actually harmed by the February 16 shooting because

Mr. Osborne did not identify Mr. Tyler as a victim and because Mr. Tyler was found only later, by police, away from the scene of the crime. Viewing the evidence in the light most favorable to the verdict, we find this argument unconvincing. Police identified Mr. Tyler as a victim of the February 17 shooting by following a trail of blood leading away from the crime scene into a nearby house, where they found him sitting in the bathroom with an untreated gunshot wound. A reasonable jury could conclude, beyond a reasonable doubt, that a person who was found shortly after a shooting suffering from an untreated gunshot wound in a house nearby, and who was tied to the scene of the crime by a trail of blood, was wounded in that very same shooting. *See Sanders*, 330 A.3d at 1032.

### 3.    *March 1 Shooting of Andrew McPhatter*

The evidence for the March 1 shooting of Mr. McPhatter follows a familiar pattern. Security footage showed a white vehicle driving down the street close behind Mr. McPhatter's vehicle. After the shooting, a white car left the area at a "high rate of speed." Historical CSLI showed that Mr. Turner's cell phones pinged a cell tower nearby at around the time the shooting took place. The police recovered 10 millimeter bullet casings from the scene, which a forensic examiner later concluded matched the gun found in Mr. Turner's white Lexus. Minutes after Mr. McPhatter was shot, Mr. Turner called Ms. Jennings, and the two exchanged

calls that day and in the five days that followed. Ms. Jennings searched for the offense reports corresponding to Mr. McPhatter's murder in Cobalt the day after the shooting.

Viewed in the light most favorable to the verdict, this evidence is sufficient to support Mr. Turner's convictions for the March 1 offenses. *See Sanders*, 330 A.3d at 1032. A white vehicle that matched the description of Mr. Turner's Lexus was seen entering and leaving the scene around the time the shooting took place, and the car's speedy exit supports an inference that it was the getaway vehicle. *See Gray*, 147 A.3d at 805-06; *Cherry*, 164 A.3d at 929. In addition, historical CSLI showed that Mr. Turner's cell phones were in the area near the time the shooting took place, and the government's expert forensic testimony permitted a jury to conclude that the bullets fired at the scene matched the gun found in Mr. Turner's car. The fact that Mr. Turner contacted Ms. Jennings on the day of the shooting and appears to have been interested in the March 1 incident further supports the verdict. Taking this evidence together, a reasonable jury could conclude, beyond a reasonable doubt, that the person in Mr. Turner's Lexus, carrying Mr. Turner's cell phones, and using the gun found in Mr. Turner's car was, in fact, Mr. Turner. *See Sanders*, 330 A.3d at 1032.

Mr. Turner raises the same general evidentiary arguments discussed and rejected above: that the gun was not definitively linked to Mr. Turner and that eyewitness accounts did not place Mr. Turner or his car at the scene. He does not make any arguments regarding the March 1-specific evidence.

For these reasons, we reject Mr. Turner's challenges to the sufficiency of the evidence supporting his convictions of the crimes of January 7, February 17, and March 1, 2017.

### B. The Fourth Amendment's Automobile Exception Permitted the Police to Temporarily Seize Mr. Turner's Car.

Mr. Turner argues that the warrantless seizure of his car from the scene of the March 8 drive-by shooting violated the Fourth Amendment and that the evidence flowing from this seizure should have been suppressed.[5] The government argues

---

[5] Mr. Turner does not challenge on appeal either of the search warrants issued after the car was seized. To the extent he suggested for the first time at oral argument that one of the warrants may have been overbroad, we decline to address this argument because "we generally do not consider arguments raised for the first time at oral argument." *Bare*, 336 A.3d at 624 n.1 (citation modified).

that the automobile exception to the warrant requirement permitted the seizure. We agree with the government.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A warrantless search or seizure "is per se unreasonable under the Fourth Amendment unless it falls within a few specific and well-established exceptions." *Beachum v. United States*, 19 A.3d 311, 319 (D.C. 2011) (citation modified). The "automobile exception" is one such "specifically established and well delineated" carve-out. *United States v. Ross*, 456 U.S. 798, 825 (1982) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)).

The police may search or seize an automobile without a warrant if the police have "probable cause to believe that the car contain[s] contraband or evidence of criminal activity." *Miller v. United States*, 346 A.3d 166, 177 (D.C. 2025); *see Chambers v. Maroney*, 399 U.S. 42, 52 (1970) (explaining that the automobile exception permits police to "seiz[e] and hold[ ] a car before presenting the probable cause issue to a magistrate [or] carry[ ] out an immediate search without a warrant" as long as there is "probable cause to search"); *Arrington v. United States*, 382 A.2d 14, 17 (D.C. 1978) ("Where probable cause exists to search an automobile when it is stopped on a highway, police may remove the vehicle to a more secure location,

such as a police station, before conducting such a search and they need not first obtain a search warrant."); *United States v. Bumphus*, 227 A.3d 559, 564 (D.C. 2020) (acknowledging that the automobile exception permits the warrantless seizure of an automobile if the police "have probable cause").  Probable cause exists "when a reasonable police officer considering the total circumstances confronting him and drawing from his experience would be warranted in the belief that an offense has been or is being committed." *Miller*, 346 A.3d at 177 (citation modified).

There can be little question that the police had probable cause to believe that Mr. Turner's car contained evidence of a crime.  Four cars parked along the street, including Mr. Turner's Lexus, were struck by bullets in a drive-by shooting.  At the very least, police had probable cause to believe that Mr. Turner's bullet-riddled car might contain bullet fragments from the shooting.  During oral argument, Mr. Turner's counsel agreed that there likely was probable cause to believe that the car contained evidence of the shooting in the form of "ballistics evidence."  This alone satisfies the automobile exception to the Fourth Amendment's warrant requirement. *See Tuckson v. United States*, 77 A.3d 357, 366 (D.C. 2013) ("In order for the automobile exception to apply, the police must have probable cause to believe that a car will contain either contraband or evidence of a crime."); *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (concluding that "[the finding] that the car contained contraband . . . alone satisfies the automobile exception to the Fourth

Amendment's warrant requirement"). As a result, the Fourth Amendment permitted this "warrantless seizure of an automobile on a public roadway." *Ross*, 456 U.S. at 807 n.9.

In arguing to the contrary, Mr. Turner focuses on distinguishing cases cited by the trial court in its opinion denying his motion to suppress, but he does not fully grapple with the legal principles governing when the Fourth Amendment permits the police to temporarily seize a vehicle without a warrant. He argues that the automobile exception cannot apply here because there were no "circumstances indicating" he committed a crime when the police seized the vehicle. But the automobile exception does not require police to have probable cause to believe that the owner or operator of the vehicle has committed a crime. Rather, as the Supreme Court explained in *Ross*, the "scope of the" automobile exception "is no broader and no narrower than a magistrate could legitimately authorize by warrant." 456 U.S. at 825. Because police had probable cause to believe Mr. Turner's white Lexus contained evidence of the drive-by shooting, the Fourth Amendment did not bar police from temporarily seizing his vehicle. *See id.* Accordingly, we reject this challenge to Mr. Turner's convictions.

### C. The Evidence Seized from Mr. Turner's Cell Phones Was Admissible Under the Good-Faith Exception to the Fourth Amendment's Warrant Clause.

Mr. Turner argues that the September 2017 warrants to search his cell phones were deficient under the Fourth Amendment. He further contends that the evidence seized from his phones should have been excluded, and that the good-faith exception to the exclusionary rule does not apply.

The government argues that the warrants and affidavits satisfied the probable cause standard as delineated in *Burns v. United States*, 235 A.3d 758 (D.C. 2020). In the alternative, the government argues that, even if the warrants were deficient, the evidence was not excludable because the good-faith exception applied. Because we agree that the evidence was admissible under the good-faith exception, we do not address whether the warrants satisfied the Fourth Amendment's Warrant Clause.

### 1. *Additional Background: the Warrants and Affidavits at Issue*

The warrant applications were submitted with three attached documents: a description of the cell phone in question, a description of the information sought, and an affidavit laying out the case for probable cause. The warrants were approved without modification of their scope. The two warrant applications are identical except for descriptions of the specific phone each seeks to search. The warrants

approved searches of the two phones for a wide swath of information potentially related to the Wahler Place and Trenton Park feud, including Mr. Turner's contacts, Mr. Turner's communications, other digital records (like social media and search history), witness information, photographs, and information pertaining to Mr. Turner's vehicle.

The two probable cause affidavits, written by Detective Jeffrey Weber, described the feud between the Wahler Place and Trenton Park neighborhoods and recited the steps police took to investigate, with a focus on the March 8 drive-by shooting and the evidence police obtained from Mr. Turner's Lexus. The affidavits described the ballistics analysis supporting a conclusion that the gun found in Mr. Turner's Lexus fired the 10 millimeter bullets at the crime scenes for shootings on January 7, February 16, February 17, February 22, and March 1, 2017, and they also noted video evidence of a car matching the description of Mr. Turner's Lexus driving away from two of the crime scenes.

The affidavits then explained why Mr. Turner's phones were likely to contain evidence related to these violent crimes. This section of the affidavits leaned heavily on Detective Weber's training and experience to tie the phone to the shootings. For example:

Based on my training and experience, I know that people who commit crimes in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity. For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity. . . .

Based on my training and experience, I know that people who possess guns, illegal drugs, unlawfully obtained money, and other contraband in Washington, D.C., often use their cell phones to capture and store images or video recordings of such contraband – sometimes called "trophy photos." They also frequently share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services. Similarly, they often refer to their guns, illegal drugs, and other contraband in text messages, emails, or other written communications that are carried out by and stored on their cell phone. . . .

Based on my training and experience, I know that victims, witnesses, and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime. They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc. In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.

In this section, Detective Weber also attempted to link the phones to specific facts uncovered in the investigation. For example, he noted that "[a]lthough an Instagram account has yet to be identified for Derek Turner, Instagram accounts for

associates of Mr. Turner have been identified," and that "a Google account believed to belong to Derek Turner was used to search for media websites for information related to shootings on Wheeler Road and South Capitol Street."

## 2. *Discussion*

"[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Fourth Amendment generally does not permit police to conduct a warrantless search of a person's cell phone incident to their arrest. *See Riley v. California*, 573 U.S. 373, 401-02 (2014). Applying these constitutional requirements in *Burns*, we explained that (1) a warrant application and supporting affidavit must demonstrate probable cause to believe that the phone will contain evidence related to specific criminal activity, and (2) the warrant may authorize a search only for the particular items of evidence reasonably within the scope of that probable cause showing. *See* 235 A.3d at 771-73.

The warrants here were issued prior to *Burns*. Even if they did not satisfy the probable cause standard for cell phone warrants as articulated in *Burns*, we suppress evidence seized through an invalid warrant only "if the police could not reasonably have relied upon the judicial officer's approval of [that] warrant," a principle otherwise known as the "good faith exception." *Abney v. United States*, 273 A.3d

852, 862 (D.C. 2022); *see In re J.F.S.*, 300 A.3d 748, 758 (D.C. 2023). Two of our recent cases, *Abney v. United States* and *In re J.F.S.*, guide our application of the good-faith exception here.

In *Abney*, we examined a warrant where the affidavit provided probable cause to believe that the owner of the cell phone had committed a crime, and, like here, relied heavily on the affiant's training and experience. *See* 273 A.3d at 863-64. That warrant sought a similar array of information tied specifically to the offenses for which the defendant was under investigation. *See id.* at 863. Because we had "not yet addressed whether probable cause to search a cell phone exists in circumstances analogous to those of the present case" in 2018, we concluded that "no decision of this court would have provided clear guidance in 2018, when the search warrant in this case was issued and executed." *Id.* at 864. Therefore, we held that the good-faith exception applied. *Id.*

Similarly, in *In re J.F.S.*, we examined a warrant issued before *Burns* that "supplied strong reason to believe that J.F.S. was involved in [the decedent's] murder and detailed with particularity the types of evidence officers could expect to find on his phone." 300 A.3d at 758. We described the affidavit as follows:

> [It] explained why the officers had probable cause to believe that J.F.S. was involved in the murder and why a broad swath of data on the phone might contain relevant

> evidence. For instance, the affidavit stated that, based on Detective Jordan's experience investigating these kinds of crimes, he would expect to find messages about planning the crime in the phone's messaging apps; "trophy photos" of weapons in photo storage apps; and searches of police investigations into the crime in the internet search history.

*Id.*

We concluded the warrant was "on all fours" with the one in *Abney* and thus applied the good-faith exception, noting that the warrant "limited the officers to searching for evidence pertaining to the murder, for which J.F.S. was a suspect, in keeping with the particularity standard as it was generally understood before *Burns*." *Id.* at 758-59.

As in those cases, we conclude that it was not unreasonable for police to rely on judicial approval of the warrants for Mr. Turner's cell phones when they were issued in 2017. To begin with, these warrants predated our opinion in *Burns*, so "the law at the time of the warrant's issuance and execution" had not yet clarified, in this jurisdiction, "the proper scope of a search warrant for a cell phone." *Abney*, 273 A.3d at 862, 865. As *Abney* explained, and *In re J.F.S.* reiterated, at that time, "[a] number of courts had held . . . that a warrant to search a suspect's cell phone was sufficiently particular and/or not overbroad because the warrant limited the officers to searching for and seizing evidence of a specific crime." *Id.* (citing cases); *see In re J.F.S.*, 300 A.3d at 758.

Viewed in light of this pre-*Burns* precedent, the affidavits here were not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," and the warrants themselves were not "so facially deficient . . . in failing to particularize the place to be searched or the things to be seized that the executing officers could not reasonably presume them to be valid." *Abney*, 273 A.3d at 862 (citation modified).

Significantly, the affidavits "established probable cause that [Mr. Turner] participated in" the shootings that took place on January 7, February 16, February 17, February 22, and March 1, 2017. *Abney*, 273 A.3d at 863; *see In re J.F.S.*, 300 A.3d at 758 ("The search warrant here was supported by a detailed affidavit, which explained why the officers had probable cause to believe that J.F.S. was involved in the murder."). The affidavits provided a timeline of the feud between Wahler Place and Trenton Park (including the fact that Mr. Turner was a victim of one of the previous incidents), and they situated the January, February, and March 2017 shootings as part of this pattern of violent conduct. They described how the ballistics evidence recovered from scenes of those shootings matched the gun found in Mr. Turner's Lexus, and they stated that video evidence showed a vehicle matching the Lexus arriving at or leaving the scenes (other than the scene of the February 16 shooting).

Moreover, like the affidavits in *Abney* and *In re J.F.S.*, the affidavits here sought to link the phones to the shootings in January, February, and March 2017 through "general information in the affidavit about cellphone use in similar circumstances" based on the affiant's training and experience. *Abney*, 273 A.3d at 863, 865 ("[B]ased on his training and experience, the affiant stated that persons committing crime in the District of Columbia (1) often use cell phones in ways that reveal their location and activities before, during, and after criminal activity, including GPS data, internet searches, and texts and emails to associates; and (2) often store and share images or recordings of weapons or other contraband."); *In re J.F.S.*, 300 A.3d at 758 ("[T]he affidavit stated that, based on Detective Jordan's experience investigating these kinds of crimes, he would expect to find messages about planning the crime in the phone's messaging apps; 'trophy photos' of weapons in photo storage apps; and searches of police investigations into the crime in the internet search history."). Because *Abney* and *In re J.F.S.* concluded that "training and experience" statements like these supported application of the good-faith exception to pre-*Burns* cell phone search warrants, we draw the same conclusion here.

This probable cause showing linking Mr. Turner's cell phones to his participation in the January, February, and March 2017 shootings satisfies the good-faith exception because, as both *Abney* and *In re J.F.S.* explained, prior to *Burns*,

"courts had generally held cell phone search warrants to be sufficiently tailored and particularized where they 'limited the officers to searching for and seizing evidence of a specific crime.'" *In re J.F.S.*, 300 A.3d at 758 (quoting *Abney*, 273 A.3d at 865). The warrants here authorized a search for "[a]ll records on the Device . . . that relate to the suspected feud between Wahler/Wheeler and Trenton Park neighborhoods, that involved numerous shootings and several homicides, believed to stem from shootings that began on May 10, 2016." *Cf. Abney*, 273 A.3d at 863 (applying the good-faith exception to a warrant authorizing a search for "data, in whatever form . . . that is evidence of the carjacking / robbery and / or the location, motive, intent, or associates of the owner of the phone at the time of the carjacking / robbery"). When read in reference to the probable cause showing describing the feud's relationship to the shootings for which Mr. Turner had been arrested, and in light of the "training and experience" sections linking the cell phone to these events, the affidavits and warrants in this case were not "so lacking in indicia of probable cause" or "so facially deficient" that it was "unreasonable" for an officer to rely on judicial approval of them at that time. *Abney*, 273 A.3d at 862 (citation modified). We emphasize, however, that nothing in this analysis suggests how the probable cause and particularity showings in these affidavits would fare if scrutinized under *Burns* and subsequent case law.

In sum, the warrants here are on par with the warrants in *Abney* and *In re J.F.S.* because (1) they were issued prior to *Burns*, (2) the supporting affidavits established probable cause to believe that the owner of the phone was involved in specific crimes, (3) the supporting affidavits linked those events to the cell phones in question using generalized observations about cell phone use by criminals based on the "training and experience" of the affiant, and (4) the warrants authorized the search of the phone for data related to the crimes for which the owner of the phone was a suspect. *See Abney*, 273 A.3d at 863-64; *In re J.F.S.*, 300 A.3d at 758. As a result, it was "reasonable" for officers to rely on judicial issuance of the warrants, and the warrants were not "so facially deficient" that officers could not presume they were valid. *See Abney*, 273 A.3d at 863. We again emphasize "the narrowness of our ruling[:]" we express no opinion whether these warrants satisfy the Fourth Amendment. *Abney*, 273 A.3d at 864. Consistent with *Abney* and *In re J.F.S.*, we conclude only that the evidence seized from Mr. Turner's cell phones is admissible under the good-faith exception. *See id.* at 862.

## IV. Issues Raised by Ms. Jennings

Like Mr. Turner, Ms. Jennings challenges her convictions on several fronts. Ms. Jennings challenges the sufficiency of the evidence to support her AAF convictions. Relatedly, she argues that the trial court plainly erred in failing to

instruct the jury on the common-law meaning of "assisted" for purposes of the AAF statute. Ms. Jennings also argues that the statements she gave during her police interview should have been suppressed because her understanding that she would be fired if she did not participate in the questioning rendered those statements involuntary in violation of the Fifth Amendment.

Because we agree that the government failed to present sufficient evidence that Ms. Jennings actually knew Mr. Turner committed any of the relevant offenses at the time she allegedly offered him material assistance, we vacate Ms. Jennings's AAF convictions. We do not reach any other potential ground for reversal of those convictions.

Ms. Jennings argues that none of her four AAF convictions can stand because the government presented insufficient evidence that she knew that Mr. Turner committed the February 17 or March 1 crimes. In addition, she contends that the government failed to show that she provided material assistance to Mr. Turner. The government argues that Ms. Jennings materially assisted Mr. Turner by providing him nonpublic information about the status of the police investigations into these crimes, and that the evidence showing the pattern of phone calls and other communications between Mr. Turner and Ms. Jennings, combined with

Ms. Jennings's searches in Cobalt and WALES, was sufficient to prove that she knew Mr. Turner committed the February 17 and March 1 shootings.

The D.C. Code criminalizes "being accessory after the fact to any crime punishable by imprisonment." D.C. Code § 22-1806. This statute, first adopted in 1901 and not amended since, does not define "accessory after the fact." *Little v. United States*, 709 A.2d 708, 711 (D.C. 1998). So we look to the common law, which "encompasses all common law in force in Maryland in 1801, unless expressly repealed or modified." *Id.*

This court has followed Maryland case law in identifying the four substantive elements of AAF:

> (1) A completed felony must have been completed by another prior to the accessoryship;
>
> (2) The accessory must not be a principal in the commission of the felony;
>
> (3) The accessory must have knowledge of the felony; and
>
> (4) The accessory must act personally to aid or assist the felon to avoid detection or apprehension for the crime or crimes.

*Id.* (quoting *Outlaw v. United States*, 632 A.2d 408, 411 (D.C. 1993)).

"To sustain a conviction of accessory after the fact, the government's evidence must establish that a defendant had knowledge of the principal's participation in the

crime." *Butler v. United States*, 481 A.2d 431, 443-44 (D.C. 1984) (citation modified); *accord Butler v. State*, 643 A.2d 389, 400 (Md. 1994) ("The term 'knowledge' means that at that time the relief or assistance was given the defendant must have had actual knowledge *that the person assisted was the one who committed the felony*.") (emphasis in original). "Mere suspicion is not enough." Wayne LaFave & Austin Scott, *Substantive Criminal Law* § 13.6(a) (Oct. 2025 Update); *accord* Lewis Hochheimer, *The Law of Crimes and Criminal Procedure* § 26 (2d ed. 1904) ("It is essential that the commission of the felony should be known to, not merely suspected by, the person aiding the principal . . . ."); 4 William Blackstone, Commentaries *37 ("[T]o make an accessary *ex post facto*, it is in the first place requisite that he knows of the felony committed."); *cf. Robinson v. United States*, 100 A.3d 95, 106 n.21 (D.C. 2014) (explaining that a person may not be convicted for aiding and abetting a crime when he is merely "aware of a substantial and unjustifiable risk" of an element of that crime) (citation modified).

"Guilty knowledge [of an accessory] may be inferred from the circumstances." *Robinson v. State*, 249 A.2d 504, 507 (Md. Ct. Spec. App. 1969); *accord Butler*, 643 A.2d at 1000 (noting that guilty knowledge "can be inferred from all the surrounding facts and circumstances in the case"). But the accessory must have actual, personal knowledge that "the [offense] had been completed" by the person they helped "prior to [the] accessoryship." *McClain v. State*, 268 A.2d 572,

577 (Md. Ct. Spec. App. 1970); *see Clark v. United States*, 418 A.2d 1059, 1061 (D.C. 1980) ("[P]ersonal knowledge, while often not susceptible to direct proof, is required for a conviction of being an accessory after the fact.").

The government at trial framed, and continues on appeal to frame, the evidence related to Ms. Jennings's AAF offenses as one long chain of assistive behavior from January to September 2017. But an AAF conviction requires proof beyond a reasonable doubt that a defendant had actual knowledge that a specific felony had been committed by a particular person at the time the accessory offered the principal material assistance in evading apprehension or detection. *See McClain*, 268 A.2d at 577 (explaining that "[w]hile [the defendant] knew at that time that [the victim] had been shot in the head, such knowledge, without more, is not the equivalent of legally sufficient proof that he knew, prior to his accessoryship, that the felony had been completed"); *Clark*, 418 A.2d at 1061 (reversing the defendant's conviction for AAF when the government failed to present "[a]dequate proof of [the defendant's] guilty knowledge").

Ms. Jennings was convicted of three counts of AAF based on the February 17 assaults (one for each victim) for assistance provided between February 21 and 23. She was convicted of one count of AAF based on the March 1 murder for assistance provided between March 1 and September 6. We examine the evidence the

government presented at trial to support the proposition that when Ms. Jennings provided Mr. Turner with material assistance during the relevant time periods, she actually knew that Mr. Turner shot at three individuals on February 17, 2017, and killed an individual on March 1, 2017. We conclude that this evidence was insufficient to support any of Ms. Jennings's four AAF convictions.

### A.    Knowledge of the February 17 Assaults

Three days after the shootings, Ms. Jennings called Mr. Turner for about a minute and thirty seconds. The day after that, on February 21, Ms. Jennings viewed a police report for the shootings in Cobalt. Ms. Jennings called Mr. Turner on February 22 for thirty-three seconds. Ms. Jennings searched Cobalt for the police reports pertaining to the February 17 and 22 shootings the next morning. The two spoke by phone that afternoon in three quick calls, for 16 seconds, 6 seconds, and 26 seconds, respectively. During this period, the Cobalt report did not identify Mr. Turner as a suspect in the February 17 shootings.

From February 21 to 23, the period during which Ms. Jennings allegedly provided material assistance to Mr. Turner, the record evidence shows two possible sources from which Ms. Jennings could have theoretically gained actual knowledge that Mr. Turner committed the February 17 shootings: the Cobalt report and Mr. Turner himself during their brief phone calls. The Cobalt report at that time

contained no information identifying Mr. Turner, and the government does not suggest that Ms. Jennings could have inferred Mr. Turner's involvement from the Cobalt report. The government points to no direct evidence of what either party said or heard during these phone calls. Instead, it suggests that the jury could have inferred from these facts that, at some point before materially assisting Mr. Turner by providing him information about the police investigation into the February 17 shootings, Ms. Jennings gained actual knowledge that Mr. Turner had committed those offenses.

The evidence permits the conclusion that Mr. Turner raised the subject of the February 17 shootings during at least one of the calls. But "where a case is built solely on circumstantial evidence and the inferences drawn from that evidence," we must be especially "mindful of the high, demanding standard of proof in a criminal case." *James v. United States*, 39 A.3d 1262, 1270 (D.C. 2012). For a jury to conclude, beyond a reasonable doubt, that Mr. Turner informed Ms. Jennings during one of these brief calls that he committed the shootings would "cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *In re D.P.*, 996 A.2d 1286, 1288 (D.C. 2010) (quoting *Rivas*, 783 A.2d at 134). Even if it is "*more likely than not*" that Mr. Turner mentioned something to Ms. Jennings raising her suspicion about Mr. Turner's involvement in these shootings, that is not enough to establish beyond a reasonable doubt that she had

actual knowledge and provided Mr. Turner with material assistance while possessing that knowledge. *Rivas*, 783 A.2d at 135 (emphasis in original). She must have actually known that Mr. Turner did it—and not "merely susp[ected]" it. LaFave & Scott, *supra*, § 13.6(a).

Our case law on the knowledge prong of AAF supports this outcome. Take *Clark*, where we found the evidence insufficient. There, the defendant "knew [the principal]; was with him the night of the robbery; was obviously waiting for him to return to the car while the robbery was in progress; drove the car which [the principal] entered after the robbery; and denied knowing [the principal] when questioned at the scene of the arrest." 418 A.2d at 1061. We acknowledged that the evidence of a guilty conscience—the defendant's denial that he knew the principal— could perhaps contribute to an "inference . . . that the appellant had some personal knowledge of [the principal's] guilt and wanted to avoid association." *Id*. But the degree of "personal knowledge" suggested by this evidence was "too sketchy and tentative," in combination with the other facts, to show that the defendant had actual, personal knowledge that the person whom he helped to escape committed the underlying robbery. *Id.* So too here: the fact that Ms. Jennings searched for the February 17 shooting shortly after her call with Mr. Turner supports the inference that she suspected his involvement based on the information relayed to her during

the call. It does not support the conclusion, beyond a reasonable doubt, that she actually knew, at that time, that Mr. Turner committed these crimes. *See id.*

*Butler* reflects a similar principle. There, we explained that the defendant's "visit to [the principal] at the D.C. Jail does not support any inference as to the content of their conversation," where the government did not offer any additional evidence to shed light on what the two talked about. 481 A.2d at 443-44. We also concluded that the defendant did not gain knowledge of the principal's participation in the murder at issue merely by reading newspaper articles that "identified" the principal as being involved. *Id.* at 443. The evidence in this case travels a little farther, because Ms. Jennings's Cobalt search supports the inference that Mr. Turner mentioned the February 17 shootings. But on this record, it would still be "pure speculation" for the jury to conclude that Mr. Turner and Ms. Jennings discussed the details of Mr. Turner's commission of the crime. *See id.* at 444. And that Cobalt report, like the newspaper in *Butler*, did not sufficiently identify Mr. Turner to permit the jury to conclude that it gave Ms. Jennings actual knowledge that he committed those crimes. *See id.* at 443.

We have drawn similar lines in our cases—between a defendant's mere suspicion and actual knowledge, and between a jury's permissible inference of knowledge and impermissible speculation about a person's mental state—outside of

the AAF context. We have held, for example, that a reasonable jury could not conclude that a minor who fled from a car with a "punched" ignition actually knew that the car was stolen, because there was no evidence that the minor saw that the ignition was "punched." *In re D.P.*, 996 A.2d at 1288-89. Sitting en banc, we held that it would be "pure speculation" for a jury to conclude that a cocaine dealer would permit someone to sit close to a bag of cocaine only if they were "part of his criminal operations," rather than due to "careless[ness]." *Rivas*, 783 A.2d at 136. We have held that an inference that the defendant "knew the drugs were in his Mustang" solely "because he was the owner of the car," often left his valuables in the car, gave no one else permission to drive the car, and drove the car the morning it was seized could not "bear the weight of proof beyond a reasonable doubt" required to establish constructive possession. *James*, 39 A.3d at 1270-72. And we have explained that the fact that a defendant cashed a check with a forged signature, without more, did not establish beyond a reasonable doubt that he knew or should have known that he had no right to the check. *Nowlin v. United States*, 782 A.2d 288, 291-92 (D.C. 2001).

The pattern of call-search-call between February 21 and 23 presented by the government in this case is consistent with the possibility that Ms. Jennings knew Mr. Turner committed the February 17 shootings. But it is "just as consistent with the hypothesis" that Ms. Jennings merely suspected that he committed these crimes.

*Roy v. United States*, 652 A.2d 1098, 1104 (D.C. 1995). Because the government bore the burden of proving Ms. Jennings's actual, "personal knowledge," *Butler*, 481 A.2d at 443 n.21 (quoting *Clark*, 418 A.2d at 1061), and not mere suspicion that Mr. Turner committed the February 17 shootings, the evidence was insufficient to support her convictions for AAF based on these offenses.

## B.     Knowledge of the March 1 Murder

Minutes after Mr. McPhatter was shot, Mr. Turner called Ms. Jennings and they spoke on the phone for one minute and thirty-five seconds. The two exchanged calls over the next several hours ranging in length from four seconds to one minute and twenty-seven seconds. On March 2, Ms. Jennings searched Cobalt for the police report corresponding to the Mr. McPhatter shooting, and they spoke later that day for two minutes and seven seconds. At this point, the Cobalt report for Mr. McPhatter's shooting did not identify Mr. Turner as a suspect. McPhatter died on March 5.[6] On March 6, Ms. Jennings called Mr. Turner and the two spoke for

---

[6] Ms. Jennings also argues that she could not have been convicted of AAF to murder for any action taken before Mr. McPhatter's death on March 5, because AAF requires a completed offense, and the offense of murder was not complete until Mr. McPhatter died. *See Little v. United States*, 709 A.2d 708, 712-14 (D.C. 1998) (holding that a defendant could not be convicted of AAF to murder because, at the time he provided material assistance, the victim was still alive). Because we conclude below that the government failed to present sufficient evidence that Ms. Jennings had actual, personal knowledge that Mr. Turner committed the March 1 shooting prior to Mr. McPhatter's death, we need not address this point.

two minutes and eight seconds. Two days later, after the drive-by shooting at the CSOSA office, Mr. Turner called Ms. Jennings and the two spoke on the phone for twenty-four minutes.

On May 13, 2017, after Mr. Turner and Ms. Hazelwood had already begun planning their scheme to have Ms. Hazelwood claim ownership of the firearm found in Mr. Turner's Lexus, Mr. Turner, Ms. Hazelwood, and Ms. Jennings spoke on a three-way call. Mr. Turner told Ms. Jennings that he wanted Ms. Hazelwood to meet her and that Ms. Jennings should "just let her know." On May 31, Mr. Turner and Ms. Hazelwood spoke over the phone, and Ms. Hazelwood represented that Ms. Jennings told her that Mr. Turner "ain't never come up." Ms. Hazelwood texted Ms. Jennings, "He said he sent his love," and Ms. Jennings replied, "Tell him me . . . too." Three months later, on the day police arrested Mr. Turner for Mr. McPhatter's murder, Ms. Jennings accessed the police report in Cobalt for Mr. McPhatter's shooting five times. Also that day, Ms. Hazelwood texted Ms. Jennings, "Can you keep me updated with anything else?" Ms. Jennings responded, "I sure will."

This evidence spans a broader time period, and it indicates, more strongly than the evidence related to the February 17 AAF offenses, that Ms. Jennings sought to help Mr. Turner. Nevertheless, this evidence is insufficient for a jury to conclude,

beyond a reasonable doubt, that Ms. Jennings actually knew that Mr. Turner committed the March 1 murder of Mr. McPhatter when she provided him with material assistance.

First, consider that the government had the burden to prove that Ms. Jennings knew that Mr. Turner committed the March 1 murder at the time she helped him by purportedly providing him with information about the police investigation. *See Clark*, 418 A.2d at 1061. Viewing the evidence in the light most favorable to the government, we think Ms. Jennings could conceivably have assisted Mr. Turner on five occasions: March 2 (the call after Ms. Jennings searched for the McPhatter shooting in Cobalt), March 6 (the call on the day after Andrew McPhatter's death), March 8 (the call on the day Mr. Turner's car was seized after the CSOSA drive-by shooting), May 31 (when Ms. Jennings relayed to Ms. Hazelwood that Mr. Turner "ain't never come up"), and September 6 (when, after Ms. Hazelwood asked Ms. Jennings to "keep [her] updated with anything else," Ms. Jennings responded, "I sure will").

The closest the government comes to satisfying its burden is the March 2 phone call that occurred after Mr. Turner spoke with Ms. Jennings the day of the shooting and after Ms. Jennings viewed the Cobalt report for that incident. But this is the same "call-search-call" pattern evidence that the government offered to

support Ms. Jennings's knowledge that Mr. Turner committed the February 17 offenses. Consistent with our conclusion above, Ms. Jennings's choice to view the Cobalt report for the March 1 shooting appears to have been prompted by her calls with Mr. Turner the previous day. But just like the February 17 AAF evidence, this evidence is insufficient to show Ms. Jennings's actual and personal knowledge, because the Cobalt report contained no indication that Mr. Turner committed the offense and the content of the phone calls is otherwise unknown. *See id.*; *Butler*, 481 A.2d at 443-44 & n.21.

The three possible acts of assistance prior to September 6 similarly lack a factual basis from which a reasonable jury could conclude that Ms. Jennings knew Mr. Turner committed the March 1 offenses. The content of the calls on March 6 and March 8 is unknown. At first glance, the timing and circumstances of the March 6 call might suggest a connection with the fact that Mr. McPhatter died the day before. But no other record evidence suggests that Ms. Jennings learned of Mr. McPhatter's death that day. Moreover, she did not take any action after speaking with Mr. Turner that day suggesting that the two discussed the March 1 murder at all (such as looking at the Cobalt report for the offense). The fact that Mr. Turner and Ms. Jennings spoke on March 8, on its own, likewise provides little indication that Ms. Jennings gained any additional knowledge related to the March 1 murder. Further, given the seizure of Mr. Turner's car that day, that call is "just as consistent

with" the inference that Mr. Turner and Ms. Jennings's lengthy conversation focused on the car seizure rather than on anything to do with the March 1 murder. *Roy*, 652 A.2d at 1104.

Next, viewing the evidence in the light most favorable to the government, we agree that Ms. Jennings's May 31 statement to Mr. Turner, communicated through Ms. Hazelwood, could be interpreted as a reassurance that Mr. Turner was not under suspicion for the murder of Mr. McPhatter. But at that point, it had been over two months since Ms. Jennings had viewed the Cobalt report for the March 1 murder. And there is no other evidence that Ms. Jennings gained information about Mr. Turner's involvement in the March 1 murder of Mr. McPhatter from any other source during this time period. *Cf. Butler*, 481 A.2d at 443 (evidence that newspapers "identified" the principal as being involved in a murder, combined with the defendant's testimony that he "read the papers just like anybody else," did not suffice to prove actual knowledge). Therefore, the evidence does not permit the inference that Ms. Jennings actually knew Mr. Turner committed the March 1 murder when she communicated to him that he was not under investigation for it.

Finally, on September 6, the day Mr. Turner was arrested for Mr. McPhatter's murder, Ms. Hazelwood asked Ms. Jennings to "keep me updated with anything else," and Ms. Jennings responded, "I sure will." We assume, without deciding, that

Ms. Jennings possessed actual, personal knowledge of Mr. Turner's participation in this murder on September 6 after viewing the Cobalt report informing her that Mr. Turner had been arrested for the crime, although this is a close question. We also assume, without deciding, that disclosing nonpublic police information can constitute aid or assistance for purposes of an AAF conviction. Even so, there is no evidence that Ms. Jennings provided Mr. Turner with material assistance on September 6 after viewing the Cobalt report: because her text message to Ms. Hazelwood merely promises the disclosure of information in the future, it was not aid or assistance "designed to hinder [Mr. Turner's] apprehension, trial or punishment." *Butler*, 481 A.2d at 443-44. And even though a reasonable jury could read Ms. Hazelwood's reference to "anything *else*" to mean that Ms. Jennings had provided "updates" prior to the transmission of Ms. Hazelwood's September 6 text message, this generalized reference to previous conduct does not prove, beyond a reasonable doubt, that Ms. Jennings provided material assistance to Mr. Turner while she possessed actual, personal knowledge that he committed the March 1 murder. In all, the government's evidence did not provide a factual basis for the jury to find, beyond a reasonable doubt, that Ms. Jennings provided material assistance to Mr. Turner while she possessed the requisite level of knowledge. *See Butler*, 481 A.2d at 443-44 & n.21; *Clark*, 418 A.2d at 1061.

Contrast this case with one where we found sufficient evidence of actual knowledge. In *Fields v. United States*, 484 A.2d 570 (D.C. 1984), we concluded that the government presented enough evidence that the defendant actually knew of a second robbery taking place at a particular restaurant because the defendant and the principal felon had robbed that same restaurant ten days before and had not obtained the money they had expected to obtain. 484 A.2d at 576-77. Moreover, the defendant sat outside the restaurant in the getaway car while his compatriot robbed it a second time, and immediately after the robbery, the defendant observed another occupant of the car hurriedly hiding the clothes worn by the principal when committing the second robbery. *Id*. We held that the jury could infer actual knowledge because it heard testimony about specific information to which the accessory was exposed that would cause a reasonable person to know that his compatriot was robbing the same restaurant for a second time. *See id; see also Downing v. United States*, 434 A.2d 409, 412 (D.C. 1981) (explaining, for purposes of an aiding-and-abetting conviction, that there was sufficient evidence that the defendant actually knew that the principal crime took place where the assailants got out of the car driven by the defendant and committed the assault, then returned to the car, and the victim ran past the car with a "bloodied face" moments later); *cf. Robinson*, 249 A.2d at 507 (reversing a conviction for AAF where the only evidence of knowledge was that the defendant was seen in the car outside the location where

the robbery took place and was apprehended with the robbers in that same car). Here, the jury heard testimony permitting only an inference that Ms. Jennings knew that particular crimes had occurred. As explained above, however, the jury heard no evidence permitting the inference that she knew Mr. Turner himself committed the offenses.

The government emphasizes "Jennings's and Turner's close relationship and frequent contact," "Jennings's eagerness to help Mr. Turner in the months following his arrest," and "Jennings's false denial of having run Cobalt searches or warrant checks on behalf of Turner." To be sure, this evidence shows that Ms. Jennings intended to aid or reassure Mr. Turner in some fashion. It certainly supports a general impression that Ms. Jennings was on Mr. Turner's "side," rather than the "side" of the MPD. But the fact that Ms. Jennings may have allowed her friendship with Mr. Turner to supplant her professional obligations as an employee of the police department does not fill the gap in the evidence for purposes of an AAF conviction. There is simply insufficient evidence in the record for a rational jury to find—beyond a reasonable doubt—that Ms. Jennings actually knew Mr. Turner committed the February 17 or March 1 offenses at the time she supposedly provided him with material assistance in the form of information about the status of the police investigations into those crimes. For these reasons, we reverse each of

Ms. Jennings's AAF convictions. *See Butler*, 481 A.2d at 444; *Clark*, 418 A.2d at 1061-62.

## V. Obstruction of Justice

Mr. Turner and Ms. Jennings both argue that the government presented insufficient evidence to convict them of obstruction of justice because the acts they committed did not impede or obstruct an "official proceeding" under D.C. Code § 22-722(a)(6). The government agrees in part, arguing that Mr. Turner's and Ms. Jennings's individual obstruction of justice convictions should be vacated because neither of them impeded or obstructed an "official proceeding," and that Mr. Turner's conspiracy-to-obstruct-justice conviction should be vacated because it is not clear whether the jury convicted him of conduct cognizable under D.C. Code § 22-722(a)(6).

### A. Additional Background

Under D.C. Code § 22-722(a)(6), "[a] person commits the offense of obstruction of justice if that person[ ] . . . [c]orruptly, or by threats of force, any way obstructs or impedes or endeavors to obstruct or impede the due administration of justice in any official proceeding." The D.C. Code defines "official proceeding" as "any trial, hearing, investigation, or other proceeding in a court of the District of Columbia or conducted by the Council of the District of Columbia or an agency or

department of the District of Columbia government, or a grand jury proceeding."

D.C. Code § 22-721(4). Section 22-721(1), in turn, defines "court of the District of

Columbia" to include only "the Superior Court of the District of Columbia or the

District of Columbia Court of Appeals." D.C. Code § 22-721(1).

Mr. Turner and Ms. Jennings were charged with violating Section

22-722(a)(6) and conspiring to do so. Each of the individual obstruction of justice

counts charged each defendant with obstructing "the due administration of justice in

an official proceeding then pending in the District of Columbia" on a particular date.

As for the conspiracy, the Second Superseding Indictment stated: "[t]he object of

the conspiracy was to corruptly impede the due administration of justice in the case

of *U.S. v. Derek Turner*, 1:17-cr-055 (CRC) (D.D.C), in which Derek B. Turner, was

charged with a federal firearms offense, *and in the process corruptly impede*

*investigations into*" the shootings taking place from November 2016 through March

of 2017.

During its closing, the government argued that the defendants had conspired

"to obstruct justice in an official proceeding pending in the District of

Columbia, . . . the official proceeding being the United States versus Derek Turner,

U.S. District Court, federal firearms charge," explaining that "[t]he byproduct of that

conspiracy . . . was to impede the investigation into two murders and four other

crimes of violence" and that "[t]he focus of the obstruction conspiracy was to distance Derek Turner from the murder weapon." When instructing the jury on the conspiracy count, the trial court described the elements of the underlying obstruction of justice charge as: "one, the defendant endeavored to obstruct or impede the due administration of justice in a pending criminal case in a court of the District of Columbia *and related investigations conducted by the Metropolitan Police Department and United States Attorney's Office*," and "two, the defendant did so with the intent to undermine the integrity of the pending proceeding *and related investigation*."

When instructing the jury on the individual obstruction of justice charges, however, the trial court defined the elements as: (1) the defendant "endeavored to obstruct or impede the due administration of justice in a proceeding in a court of the District of Columbia," and (2) the defendant "did so with the intent to undermine the integrity of the pending proceeding." The court did not mention the investigations into the November 2016 through March 2017 shootings.

## B. Discussion

The parties agree that a case pending in the United States District Court for the District of Columbia is not an "official proceeding" under Section 22-722(a)(6) and that a person cannot be convicted under D.C.'s obstruction of justice statute

solely for obstructing a criminal proceeding pending in federal court. They part ways, to an extent, over why that legal conclusion requires the vacatur of Mr. Turner's and Ms. Jennings's obstruction of justice convictions.

The government concedes that Ms. Jennings and Mr. Turner are legally innocent of the individual obstruction of justice offenses for which they were convicted "because the jury instructions on the substantive counts (43-47 and 49-51) rested exclusively on obstructing the pending district court case." But the government sees the conspiracy-to-obstruct-justice count, for which only Mr. Turner was convicted, differently. It argues that the jury was presented with two theories of Mr. Turner's culpability: (1) his actions interfered with his pending district court case or (2) his actions interfered with the ongoing investigation into the violent events of November 2016 through March 2017, for which he was ultimately indicted in this case. In the government's view, a police investigation can constitute an "official proceeding" under Section 22-722(a)(6), even if a pending federal district court case cannot. Ms. Jennings, who highlighted this aspect of the government's argument in her reply brief, insists that she could not have been charged with obstruction of justice under Section 22-722(a)(6) merely for interfering with a police investigation, because "obstruction must be of a court proceeding, not a police investigation." Despite disagreeing over whether a person can be convicted of obstructing justice for interfering with a police investigation, the government

concedes that "the conviction should nonetheless be vacated because the record does not disclose on which theory the jury convicted."

We agree that each of Ms. Jennings's and Mr. Turner's obstruction of justice and conspiracy to obstruct justice convictions must be vacated. First, the parties are correct that a criminal case in federal district court does not qualify as an "official proceeding" under D.C.'s obstruction of justice statute. We interpret a statute to effectuate "the legislature's intent," which, as a "general rule . . . is to be found in the language that [the lawmaker] has used." *Wynn v. United States*, 48 A.3d 181, 188 (D.C. 2012) (quoting *Peoples Drug Stores v. District of Columbia*, 470 A.2d 751, 753 (D.C. 1983) (en banc)). Accordingly, "[w]e will give effect to the plain meaning of a statute 'when the language is unambiguous and does not produce an absurd result.'" *Facebook, Inc. v. Wint*, 199 A.3d 625, 628 (D.C. 2019) (quoting *McNeely v. United States*, 874 A.2d 371, 387 (D.C. 2005)). In addition, "where the context shows that the draftsmen's mention of one thing . . . reasonably[ ] impl[ies] the preclusion of alternatives," we will apply that "common-sense principle"—also known as expressio unius est exclusio alterius—to discern a statute's meaning. *Odeniran v. Hanley Wood, LLC*, 985 A.2d 421, 427 (D.C. 2009) (quoting *Indep. Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000)).

Section 22-721(4) defines "official proceeding," for purposes of Section 22-722(a)(6), to include a proceeding in a "court of the District of Columbia." "[C]ourt of the District of Columbia," in turn, "means the Superior Court of the District of Columbia or the District of Columbia Court of Appeals." D.C. Code § 22-721(1). None of these provisions mentions the United States District Court for the District of Columbia. The existence of the federal courts "must have been familiar" to the drafters of D.C.'s obstruction of justice statute. *Odeniran*, 985 A.2d at 427. As a result, "it is a fair surmise that the drafters of the regulations deliberately excluded" the United States District Court for the District of Columbia from the list of entities encompassed by the definition of "official proceeding" in Sections 22-721(4) and (1). *Id.* Therefore, Section 22-722(a)(6) does not prohibit obstructing or impeding, or endeavoring to obstruct or impede, a proceeding in the United States District Court for the District of Columbia. Because the government concedes that the "official proceeding" listed in each of Mr. Turner's and Ms. Jennings's individual obstruction of justice convictions was Mr. Turner's federal district court case, each of Mr. Turner's and Ms. Jennings's individual obstruction of justice convictions must be vacated.

As for Mr. Turner's conviction for conspiracy to commit obstruction of justice, we decline to decide whether a person can be convicted of obstructing justice for interfering with a police investigation and agree with the government that vacatur

is warranted because the jury might have convicted him on the legally impermissible theory that he interfered with a proceeding in the United States District Court for the District of Columbia. "[W]henever various alternative theories of liability are submitted to a jury, any one of which is later determined to be improper, the conviction cannot be sustained . . . because of the possibility that the verdict might have rested entirely upon the improper theory." *Jones v. United States*, 16 A.3d 966, 970 (D.C. 2011) (quoting *Barkley v. United States*, 455 A.2d 412, 414 (D.C. 1983)). Neither Mr. Turner nor Ms. Jennings contests the government's concession that "the record does not disclose" whether the jury convicted Mr. Turner based on a finding about his interference with his pending federal court case or based on a finding about his interference with the MPD's investigation of the shootings. We agree that the record does not indicate on which theory of liability the jury convicted, because the government, in its closing argument, and the trial court, in its jury instructions, mentioned both theories. Therefore, Mr. Turner's conviction for conspiracy to commit obstruction of justice must also be vacated. *See id.*

## VI.    Conclusion

For the foregoing reasons, we vacate each of Mr. Turner's and Ms. Jennings's convictions for obstruction of justice, and we vacate Mr. Turner's conviction for conspiracy to obstruct justice. We also vacate each of Ms. Jennings's convictions

for being an accessory after the fact. We affirm Mr. Turner's convictions for assault, murder, and related firearm possession offenses. We remand to the trial court for further proceedings consistent with this opinion.

*So ordered.*